**[J-49-2013]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 656 CAP |
| | : |
| Appellee | : Appeal from the Order entered on |
| | : 03/27/2012 in the Court of Common Pleas, |
| | : Criminal Division of Erie County at No. |
| v. | : CP-25-CR-0000842-2001 |
| | : |
| | : SUBMITTED: May 30, 2013 |
| STEPHEN TREIBER, | : |
| | : |
| Appellant | : |

**OPINION**

**MR. JUSTICE EAKIN**            **DECIDED: August 17, 2015**

Appellant, Stephen Treiber, appeals from the order denying him collateral relief from his criminal convictions and death sentence pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546. We affirm.

On the night of March 9, 2001, appellant set fire to his home while his girlfriend, Denise Riddle, and his two-year-old daughter, Jessica, slept inside. As the home burned, appellant and Ms. Riddle escaped, but Jessica remained in her crib until firefighters removed her; however, they were unable to revive her. Appellant was charged with criminal homicide, reckless endangerment, and multiple counts of arson; the Commonwealth gave notice of its intent to pursue the death penalty.

Appellant's neighbor, who went to help after seeing smoke emanating from the home, testified at trial that appellant and Ms. Riddle were standing on a second-story deck, and Ms. Riddle screamed for help while appellant calmly stood by with his arms

folded. Appellant asked about the well-being of his dogs but, when referring to Jessica, said, "[T]he firemen will get her. She's probably dead anyway." N.T. Trial, 9/30/02, at 97. A fire marshal who investigated the scene testified the fire had been started at two points of origin — one in the basement and the other in the garage — using gasoline, clothing, straw, and candles. He noted the home's security system had been disabled and one wire had been cut. The marshal also observed a chain ladder affixed to the residence, which, he reasoned, had been recently tethered to the home because it had no signs of rust. Members of the fire and police departments also testified Jessica's bedroom door was open, and stated appellant was unusually calm and inquired only about his dogs. At the scene, police told appellant they were searching for Jessica, to which he responded, "[W]ell, it's probably too late anyway." Id., at 242.

At trial, Ms. Riddle described appellant as very controlling, stating he implemented and enforced rules that shoes not be worn in the home, and that bedroom doors be closed and locked. Ms. Riddle also mentioned appellant had previously forbidden her from going to a local bar, once even threatening to burn it down if she went there again. She testified that, during the fire, appellant escorted her and two of their dogs onto the deck, but told her he could not rescue Jessica because "the smoke was too bad[.]" N.T. Trial, 10/2/02, at 124-25. Yet, Ms. Riddle recalled she did not observe much smoke at that time. She also testified that after Jessica was pronounced dead, appellant instructed her not to talk to police, and when she expressed her sorrow of Jessica's death to appellant, he replied they "could always make another little Jessica[.]" Id., at 136.

The Commonwealth introduced extensive evidence of appellant's preparatory activities and behavioral changes. Weeks before the fire, appellant became obsessed with fire safety, making Ms. Riddle and her 22-year old son, Erik Keith, practice fire-evacuation routes. One month before the fire, appellant purchased straw on four

separate occasions, along with two five-gallon gas cans, and he bought gasoline on two separate occasions the day of the fire. The week before the fire, appellant affixed a chain ladder to the residence as a means of escape. Four days before the fire, appellant called an ADT Security Services employee to his home to update his security system. He disclosed to her he knew how to disable the security system and said a fire might start in his home in a few days. A funeral director testified that during meetings with appellant for Jessica's funeral arrangements, he did not show emotion and repeatedly referred to Jessica as "it." N.T. Trial, 10/3/02, at 161.

Evidence of appellant's motive and intent was also introduced at trial. Appellant's unwillingness to pay child support was established by testimony from Jodie Treiber, Jessica's mother. Ms. Treiber stated appellant had a visitation weekend with Jessica scheduled for March 9 — the weekend of the fire — but appellant insisted he take Jessica early, i.e., the previous Tuesday of that week. When appellant picked up Jessica, Ms. Treiber informed him she intended to increase his child-support payments. Jamie Pianta,[1] who accompanied appellant and Mr. Keith on the trip to pick up Jessica, testified appellant discussed his plans to kill Jessica to avoid paying child support, stating he would use rope, gasoline, straw, and candles to start a fire in the home. Mr. Pianta said appellant expressed the same plans to him and Mr. Keith about one month earlier, during another trip to pick up Jessica. Other witnesses testified about appellant's financial motives for the murder. For instance, one month before the fire, appellant tried to increase the limits on his credit card and his homeowner's insurance, and sought to purchase life insurance on Jessica, naming himself as beneficiary. He also changed his automobile comprehensive deductible but did not alter his collision insurance.

---

[1] As discussed infra, Mr. Pianta was Mr. Keith's friend and lived with Mr. Keith at one of appellant's rental properties. Both Mr. Pianta and Mr. Keith worked for appellant in lieu of rent.

The Commonwealth established appellant took steps to make it appear that someone else started the fire. Specifically, it asserted appellant, about six weeks before the fire, contrived a threatening note and surreptitiously attached it to his own mailbox, arranging for Ms. Riddle to find it and report it to police. The Commonwealth contended the note was appellant's effort to cast suspicion away from himself and onto an unknown intruder. The note, which was comprised of letters cut from printed materials glued onto the paper, was addressed to "Steve," and said, "[G]et rid of dogs or I kill them and burn you out again." N.T. Trial, 10/2/02, at 88-89. Earlier that day, appellant called Ms. Riddle and told her someone was lurking around their home. When police arrived to investigate, appellant told them the doorbell rang earlier in the night but no one was there, and he saw the note affixed to the mailbox at that time. Police discovered hairs stuck to glue in the envelope and subsequently retained the services of DNA experts Dr. Joy Halverson and Dr. Christopher Basten. They determined one of the hairs was a canine hair, compared it to the hair of appellant's dog, and concluded the hair was 1,000 times more likely to have come from appellant's dog than any other dog.

A jury convicted appellant of first degree murder, 18 Pa.C.S. § 2502(a), arson endangering persons, id., § 3301(a), arson endangering property, id., § 3301(c), and recklessly endangering another person, id., § 2705. At the penalty phase, the jury found three aggravating circumstances and two mitigators. The aggravating circumstances were: (1) appellant committed a killing while in the perpetration of a felony (arson), 42 Pa.C.S. § 9711(d)(6); (2) appellant knowingly created a grave risk of death to another person other than the victim of the murder, id., § 9711(d)(7); and (3) the victim was a child under 12 years of age, id., § 9711(d)(16). As for the mitigating circumstances, the jury found appellant had no significant history of prior criminal convictions, id., § 9711(e)(1), and a positive work history, falling within § 9711(e)(8)'s catch-all provision. However, the

jury determined the aggravating circumstances outweighed the mitigating circumstances and sentenced appellant to death. This Court affirmed appellant's convictions and death sentence, Commonwealth v. Treiber, 874 A.2d 26, 33 (Pa. 2005), and the United States Supreme Court denied certiorari, Treiber v. Pennsylvania, 547 U.S. 1076 (2006). The same counsel represented appellant at trial and on direct appeal.[2]

Appellant filed a pro se PCRA petition, and counsel from the Federal Community Defender Office (FCDO) entered their appearance on appellant's behalf[3] and filed an amended petition. The PCRA court held evidentiary hearings on ten separate dates and denied relief. Appellant presents 14 issues for review:

I. Was trial counsel ineffective for failing to challenge the Commonwealth's dog DNA evidence?

II. Was the Commonwealth's dog DNA evidence false and unreliable in violation of [a]ppellant's rights to due process and a fair trial?

III. Was trial counsel ineffective for failing to reasonably investigate, develop[,] and present evidence in the guilt phase undermining the Commonwealth's motive theories and supporting the defense?

IV. Did trial counsel ineffectively fail to impeach Jamie Pianta and ineffectively fail to request a corrupt source instruction with regard to Pianta's testimony?

V. Was [a]ppellant convicted on the basis of inaccurate and unreliable testimony, in violation of his 8th and 14th Amendment rights?

---

[2] Appellant was represented at trial by both Timothy Lucas and Timothy George. Attorney Lucas was primarily responsible for the guilt phase, and represented appellant in post-sentence proceedings and on direct appeal. Attorney Lucas hired Attorney George solely to handle the penalty phase. For clarity purposes, we will simply refer to either attorney as appellant's trial counsel.

[3] On February 8, 2013, this Court ordered the FCDO to produce a copy of any federal appointment order it may have secured in this matter authorizing it to pursue a PCRA petition in Pennsylvania. The FCDO replied it was not appointed but that appellant requested the FCDO's representation.

VI.     Did the Commonwealth violate its Brady[4] obligations?

VII.    Did the trial court abuse its discretion when it failed to voir dire the remaining jurors after dismissing [a] juror[]?

VIII.   Was trial counsel ineffective for failing to present good character evidence at [the] guilt phase?

IX.     Was [a]ppellant erroneously denied his constitutional right to represent himself at trial?

X.      Was trial counsel ineffective for failing to reasonably investigate, develop[,] and present expert evidence at [the] guilt phase?

XI.     Is [a]ppellant entitled to relief from his death sentence because counsel was ineffective for failing to investigate, develop[,] and adequately present substantial mitigating evidence?

XII.    Is [a]ppellant entitled to a new sentencing hearing where errors in the trial court's penalty phase instructions, both individually and cumulatively, denied appellant a fair and reliable sentencing hearing, and was counsel ineffective for failing to object or request proper instructions?

XIII.   Was the aggravating circumstance of grave risk of death improperly applied and submitted to the jury in violation of [a]ppellant's rights to a fair trial and reliable sentencing, and was counsel ineffective for failing to object and raise this claim?

XIV.    Was [a]ppellant denied full and fair review in the PCRA [c]ourt?

Appellant's Brief, at 1-2.

"[A]s a general proposition, we review a denial of PCRA relief to determine whether the findings of the PCRA court are supported by the record and free of legal error." Commonwealth v. Dennis, 17 A.3d 297, 301 (Pa. 2011) (citation omitted). A PCRA court's credibility findings are to be accorded great deference, and where supported by the record, such determinations are binding on a reviewing court. Id., at 305 (citations omitted). To obtain PCRA relief, appellant must plead and prove by a preponderance of the evidence: (1) his conviction or sentence resulted from one or more of the errors

---

4 Brady v. Maryland, 373 U.S. 83 (1963).

enumerated in 42 Pa.C.S. § 9543(a)(2); (2) his claims have not been previously litigated or waived, id., § 9543(a)(3); and (3) "the failure to litigate the issue prior to or during trial ... or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel[,]" id., § 9543(a)(4).  An issue is previously litigated if "the highest appellate court in which [appellant] could have had review as a matter of right has ruled on the merits of the issue[.]"  Id., § 9544(a)(2).  "[A]n issue is waived if [appellant] could have raised it but failed to do so before trial, at trial, ... on appeal or in a prior state postconviction proceeding."  Id., § 9544(b).

To be entitled to relief on an ineffectiveness claim, a PCRA petitioner must establish: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) he suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability the result of the proceeding would have been different.  Commonwealth v. Chmiel, 30 A.3d 1111, 1127 (Pa. 2011) (employing ineffective assistance of counsel test from Commonwealth v. Pierce, 527 A.2d 973, 975-76 (Pa. 1987)).[5]  Counsel is presumed to have rendered effective assistance.  Commonwealth v. Ali, 10 A.3d 282, 291 (Pa. 2010).  Additionally, counsel cannot be deemed ineffective for failing to raise a meritless claim. Commonwealth v. Jones, 912 A.2d 268, 278 (Pa. 2006).  Finally, because a PCRA petitioner must establish all the Pierce prongs to be entitled to relief, we are not required to analyze the elements of an ineffectiveness claim in any specific order; thus, if a claim fails under any required element, we may dismiss the claim on that basis.  Ali, at 291.

---

[5] Pierce reiterates the preexisting three-prong test for ineffective assistance of counsel in Pennsylvania and holds it to be consistent with the two-prong performance and prejudice test in Strickland v. Washington, 466 U.S. 668 (1984).  Pierce, at 976-77.

## I. GUILT PHASE CLAIMS

**Issues I & II:   The Commonwealth's Canine DNA Evidence**

As previously noted, the Commonwealth's theory at trial was that appellant attempted to make it appear that someone else started the fire by creating a threatening note and attaching it to his mailbox.   See N.T. Trial, 10/2/02, at 85-92; N.T. Trial, 10/7/02 at 95-98.   While initial testing of the note produced no forensic evidence, a scientist ultimately found two hairs embedded in the dried glue on the paper and concluded one of the hairs was canine.   See N.T. Trial, 10/3/02, at 14-17.   Police sought to ascertain whether the hair originated from appellant's dogs, as this would implicate appellant as the note's author.   Accordingly, they sent the hair samples to Joy Halverson, DVM — a California veterinarian and epidemiologist, who also had practical experience in molecular biology and held herself out as a forensic canine DNA analyst.   See id., at 109-12.   Police also provided blood and saliva reference samples from appellant's dogs. The district attorney notified appellant's counsel of the scheduled testing.

In response, appellant's counsel telephoned several individuals knowledgeable in animal DNA analysis, including Marcia Eggleston, Ph.D, who oversaw the genetic testing of animals at the University of California, Davis, to determine whether a defense expert should be present during the testing.   See N.T. PCRA Hearing, 8/10/09, at 32-34.   Dr. Eggleston informed counsel she was familiar with Dr. Halverson's work, Dr. Halverson was qualified to process canine DNA samples using standard protocols, and the procedures were straightforward and generally accepted within the scientific community. See id., at 39-40, 151.   Dr. Eggleston offered to review the results of Dr. Halverson's test, but she did not tell counsel: (1) canine DNA evidence was novel; (2) Dr. Halverson was not qualified; (3) the genetic DNA markers used by Dr. Halverson were invalid; or (4) her methodology was flawed.   See id., at 219.   Based on those conversations — but prior to

actual testing or preparation of any report — counsel abandoned further inquiry into the scientific validity of canine DNA evidence and ceased efforts to obtain a defense expert; instead, he chose a strategy of advancing the notion that the hairs were merely contaminants, which came in contact with the note after it was prepared.  See id., at 40-41.

In pre-trial discovery, the Commonwealth produced reports by Dr. Halverson and statistician Christopher Basten, Ph.D concerning the hair sample.  Dr. Halverson's reports declared a match between the hair sample found on the note and the reference blood sample taken from appellant's dog, even though the report admitted the sample was "suboptimal" and produced "low template quantity or quality" DNA.  Reports of Joy Halverson, DVM, 10/2/01, at 4, & 8/26/02, at 1, available at Petitioner's Evidentiary Hearing Exhibits, Vol. IX, tab 2 & 3.  Dr. Halverson initially opined:

> Assuming that [the utilized] data group is representative of the general dog population and is the correct data set for comparison in this case, the product rule shows that the likelihood that the evidence sample [] and reference blood sample are from different dogs and match by random chance exceeds 1 in 1.6 million.

Report of Joy Halverson, DVM, 10/2/01, at 5, available at Petitioner's Evidentiary Hearing Exhibits, Vol. IX, tab 2.  Yet, in a supplemental report, she indicated that since her last report she "completed coursework on forensic DNA analysis and ha[d] a greater understanding of the use of the likelihood ratio for estimating the significance" of a match between the hair and reference samples.  Report of Joy Halverson, DVM, 8/26/02, at 1, available at Petitioner's Evidentiary Hearing Exhibits, Vol. IX, tab 3.  She explained she had come to appreciate the necessity of abandoning a straightforward application of the product rule, in favor of applying a likelihood ratio which could correct for "population substructure found in dog breeds and for the data missing from profiles of suboptimal DNA samples, such as the hair in this case."  Id.  By applying this ratio and

cross-referencing Dr. Basten's supportive report, Dr. Halverson adjusted her previous probability estimate and concluded it was 1,000 times more likely the hair came from appellant's dog than any other dog.

After reviewing these reports, appellant's counsel did not consult with a DNA expert or file a pre-trial motion challenging the admissibility of the experts' testimony; rather, he maintained the "contamination" strategy. At trial, Dr. Halverson testified — consistent with her report — that her testing revealed a match between the hair sample and the reference blood sample from appellant's dog. She concluded it was "a thousand times more likely that they match because they came from the same dog than because they came from two dogs by coincidence." N.T. Trial, 10/3/02, at 129. This calculation was supported through Dr. Basten's testimony. See id., 139-41. On cross-examination, trial counsel did not question Dr. Halverson regarding her qualifications and did not object when she was proffered as an expert in canine DNA analysis and comparison. See id., at 116. Instead, trial counsel told Dr. Halverson, "I'm certainly not going to quibble with you about your findings." Id., at 132. Trial counsel made no inquiries about her protocols, the actual testing, or the ensuing analysis; he merely confirmed Dr. Halverson was unfamiliar with the source of the hair samples tested and asked her a few questions about the second hair found on the note, which had yielded no DNA profile. See id., at 132-34. He did not cross-examine Dr. Basten at all. See id., at 143.

Appellant testified at trial and denied creating the threatening note or committing arson or murder. See N.T. Trial, 10/5/02, at 36-37, 61-62. Consistent with trial counsel's strategy, a DNA expert was not presented in the defense's case. During closing arguments, trial counsel did not dispute Dr. Halverson's DNA match, instead advancing the contamination proposition. See N.T. Trial, 10/7/02, at 75-77. In its

closing, the Commonwealth stressed the canine DNA evidence connected appellant to the note, demonstrating his preparation and intent to carry out the arson and murder. The Commonwealth also emphasized the fact the hairs were embedded in dried glue, arguing this proved the hairs became attached to the note while the glue was still wet, i.e., during the note's preparation. See id., at 96-97.

At the PCRA evidentiary hearings, appellant offered expert testimony from Dr. Eggleston, who, like Dr. Halverson, is a member of the International Society for Animal Genetics (ISAG), a scientific organization established to transfer information among animal-genetics labs worldwide. N.T. PCRA Hearing, 8/10/09, at 138. Dr. Eggleston was the chairperson for the canine-genetics workshop at the ISAG and the executive director of Veterinary Genetics Lab (VGL), a reference lab for the ISAG. Id., at 140. Dr. Eggleston disclosed Dr. Halverson's "ten marker" methodology was known to her and ISAG as early as 1996, id., at 214-16, 222, and both she and VGL analyzed those ten markers from 2000-2002, id., at 143-45, 147, 163. She also stated any worldwide lab interested in analyzing and testing Dr. Halverson's markers was able to do so at that time. Id., at 145. Although Dr. Eggleston conceded canine DNA testing was generally accepted within the scientific community, id., at 205, she testified Dr. Halverson's particular methodologies and practices used in appellant's case were not, id., at 161, 163, 166-202. She stated only four of Dr. Halverson's ten markers were considered adequate. Id., at 165. Based on her own analysis, Dr. Eggleston concluded there was no scientifically reliable way to determine whether the hair sample came from appellant's dog; thus, she opined the results of the testing were inconclusive. Id., at 202.[6] In

---

[6] Appellant also offered expert testimony from Dr. Randall Libby and Dr. Laurence Mueller, who, like Dr. Eggleston, indicated the genetic and statistical methods underlying the trial testimony of Dr. Halverson and Dr. Basten were not generally accepted in the (continued…)

response, the Commonwealth presented testimony from Dr. Halverson and Dr. Basten to the effect that their methods were generally accepted. See, e.g., N.T. PCRA Hearing, 10/29/09, at 10-11 (Dr. Halverson); id., at 151 (Dr. Basten).

As to her conversation with appellant's trial counsel, Dr. Eggleston testified counsel inquired whether an expert should be present to observe the testing of the hair by the Commonwealth's experts. N.T. PCRA Hearing, 8/10/09, at 148-49. She told counsel canine DNA testing was generally accepted in the scientific community and informed him an expert was not needed because Dr. Halverson had been conducting canine DNA analysis for many years and, thus, Dr. Halverson likely knew the accepted protocols for testing and extracting DNA from the hair. Id., at 150, 213-14, 216-17. Yet, she told counsel an expert should evaluate Dr. Halverson's interpretation of the testing and offered to conduct such evaluations. Id., at 150-52. She also stated it was not possible to analyze Dr. Halverson's methodologies or conclusions until testing was completed. Id., at 153-54, 174-75. Dr. Eggleston did not tell counsel that canine DNA evidence was novel, Dr. Halverson was not qualified, the genetic DNA markers used by Dr. Halverson were invalid, or her methodology was flawed. See id., at 219. She also admitted to vouching for Dr. Halverson's ability to process the samples, which encompasses the use of DNA markers. Id., at 221. Dr. Eggleston had only one telephone conversation with counsel, and counsel never indicated he would send her Dr. Halverson's reports after testing or retain her to review the reports, nor did he ask her to refer him to another DNA expert. Id., at 154-55, 203.

Appellant's trial counsel also testified at the PCRA evidentiary hearings. He stated Dr. Eggleston notified him that canine DNA testing was straightforward, she knew

_____

(…continued)
relevant scientific communities. See, e.g., N.T. PCRA Hearing, 8/11/09, at 117 (Dr. Libby); N.T. PCRA Hearing, 8/12/09, at 64 (Dr. Mueller).

Dr. Halverson, and the procedure was generally accepted in the scientific community. Id., at 39-40.  Trial counsel remarked he initially considered a Frye[7] challenge; however, after discussing canine DNA evidence with experts, including Dr. Eggleston, he concluded a Frye challenge or any other pre-trial motion would be inappropriate.  N.T. PCRA Hearing, 8/10/09, at 34-36, 39-41.  He also decided it would be futile to call a defense DNA expert at trial and cross-examine Dr. Halverson and Dr. Basten on the validity of their findings.  Id., at 40-41.  Trial counsel explained the reasons for his "contamination" strategy, one of which was based on his conversations with canine DNA experts.  He also recalled appellant told him his dogs were outside before the threatening note was discovered, which, he reasoned, was one explanation for the hair. Id., at 80-81.  Trial counsel felt a contamination theory would be further supported by the fact the note had been in the Commonwealth's possession for six months before a hair had been found and had been transported various times between laboratories and other locations.  Id., at 36, 40-41, 80-81.  In addition, he posited because the Commonwealth never offered an explanation for the second hair found on the note, that hair must have been the result of contamination.  Id.

With this background in mind, we turn to appellant's allegations of error.   Initially, he contends the Commonwealth's canine DNA evidence should not have been admitted at his trial.  However, as the Commonwealth points out, appellant did not raise this issue on direct appeal.  By failing to challenge the evidence, appellant waived his underlying contentions to the admissibility of the Commonwealth's canine DNA evidence and the

---

[7] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).  Pennsylvania follows the Frye test, which provides novel scientific evidence is admissible if the methodology underlying the evidence has general acceptance in the relevant scientific community.  See Grady v. Frito–Lay, Inc., 839 A.2d 1038, 1044 (Pa. 2003).

manner in which this evidence was admitted at trial.[8]   See 42 Pa.C.S. § 9544(b). Because appellant's remaining claims are couched in terms of ineffectiveness, we proceed to those claims.

We address appellant's ineffectiveness claims collectively and, as permitted under Strickland, analyze the prejudice prong first.   Appellant asserts trial counsel was ineffective for failing to: (1) file a Frye motion challenging the admissibility of the Commonwealth's canine DNA evidence; (2) challenge Dr. Halverson's qualifications; (3) cross-examine the Commonwealth's canine DNA experts; and (4) present a defense canine DNA expert.[9]

Appellant claims a Frye motion would have likely been granted because, at the time of trial, neither forensic canine DNA evidence nor Dr. Halverson's specific methodologies[10] were generally accepted as reliable within the scientific community.

---

[8] Appellant attempts to surpass waiver by cloaking a standard evidentiary claim with allegations of constitutional violations as a result of the introduction of "false and unreliable" canine DNA evidence.   Appellant's Brief, at 20-22; see also Appellant's Reply Brief, at 1-2.   Yet, appellant's argument simply challenges the admissibility of the canine DNA evidence.

[9] Appellant also claims the PCRA court improperly conflated human DNA evidence with canine DNA evidence and erroneously concluded, since human DNA evidence has been previously accepted by this Court, canine DNA must also be accepted.   We find this contention meritless.   While the PCRA court did point out DNA evidence has been accepted by Pennsylvania courts since 1994, that statement was dictum.   See PCRA Court Opinion, 3/27/12, at 29 (citing Commonwealth v. Crews, 640 A.2d 395, 400-02 (Pa. 1994)).   The court did not determine canine DNA evidence was not novel because human DNA evidence is generally accepted; contrarily, the court independently and specifically concluded, based on Dr. Halverson's and Dr. Eggleston's testimony, canine DNA evidence was not novel at the time of appellant's trial.   See id., at 29-32.
[10] In support, appellant cites State v. Leuluaialii et al., 77 P.3d 1192 (Wash. Ct. App. 2003), which held canine DNA evidence was not generally accepted in the scientific community, id., at 1197-98.   Appellant relies on Leuluaialii particularly because Dr. Halverson testified to a similar effect in that case — based on her methodology, she (continued…)

He argues he was prejudiced because the canine DNA evidence was crucial to the Commonwealth's case, as it was the only forensic evidence admitted at trial and juries tend to give forensic evidence substantial weight. Had such evidence been excluded, appellant claims, the Commonwealth's circumstantial case would have been severely diluted and the defense's theory — that an unknown intruder burned the home — would have been more persuasive and credible.

The Commonwealth responds that the PCRA court's conclusions were supported by the record and free of legal error. The Commonwealth argues Dr. Eggleston should have made counsel aware of any flaws in Dr. Halverson's methodologies at the time of their conversation, and "[t]o place an expert's alleged error at counsel's feet unmoors the analysis from Strickland." Commonwealth's Brief, at 18 (citing Commonwealth v. Lesko, 15 A.3d 345, 382 n.18 (Pa. 2011)). Regardless, the Commonwealth contends, the court would have denied the Frye motion, and thus, appellant was not prejudiced by counsel's failure to file the motion. Specifically, the Commonwealth notes Dr. Halverson's testing was generally accepted in the scientific community at the time of trial, appellant's own canine DNA expert testified to the same effect at the PCRA hearings, and a difference of expert opinion has no bearing on the admissibility of Dr. Halverson's theories and methodologies.

Appellant further contends counsel was ineffective for failing to challenge Dr. Halverson's qualifications because she did not qualify as an expert at the time of his trial due to her lack of sufficient experience, knowledge, and education relevant to canine DNA testing. In support, appellant claims Dr. Halverson's experience focused on bird DNA testing and she did not publish materials involving canine DNA identification.

---

(…continued)

matched blood from the victims' dog to blood found on the defendants' clothing. See id., at 1195-96.

Noting Dr. Halverson stated her qualifications stemmed from on-the-job training, appellant asserts she is unqualified because a mere technician lacking educational credentials cannot serve as an expert in forensic DNA evidence. Appellant claims he was prejudiced because, had counsel objected to Dr. Halverson's qualifications, the court would have disqualified her as an expert and the Commonwealth would not have been able to find a substitute expert, as she was the only individual in the country willing to testify about canine DNA testing.

The Commonwealth argues a challenge to Dr. Halverson's qualifications under Pa.R.E. 702 would have been meritless given her qualifications and experience. It claims even if Dr. Halverson lacked the relevant education or degree, she was qualified to render an expert opinion based on her training and experience. Thus, the Commonwealth contends, counsel's decision to forego such a challenge was reasonable and did not prejudice appellant.

Appellant next submits trial counsel ineffectively challenged Dr. Halverson's reliability, particularly her credentials, methodologies, and calculations, and he failed to question her on the suitability of the labs in which she tested. He further claims proficient cross-examination would have yielded Dr. Halverson's and Dr. Basten's bias. Appellant opines effective cross-examination would have undermined the Commonwealth's claim that the hair found on the threatening note matched his dog, thereby weakening the Commonwealth's arguments regarding intent, identity, premeditation, and absence of mistake. He concludes "empirical evidence confirms the prejudice from trial counsel's deficient performance. … Confidence in the outcome of [a]ppellant's trial is undermined." Appellant's Brief, at 19.

The Commonwealth claims counsel's cross-examination was proper in light of the information received from Dr. Eggleston, i.e., her vouching for Dr. Halverson's

qualifications and abilities, and appellant's suggestion that trial counsel should have cross-examined Dr. Halverson in the same manner as PCRA counsel is improperly retrospective.

Appellant argues counsel's lack of cross-examination and concession of the admissibility of the canine DNA evidence made "presentation of expert testimony in the defense case all the more incumbent." Id. Based on these alleged errors, he asserts he was prejudiced by counsel's failure to call a canine DNA expert[11] because such an expert would have rebutted all aspects of Dr. Halverson's and Dr. Basten's testimony. Appellant contends counsel's ineffectiveness led the jury to assume the hair sample found on the note matched appellant's dog and, thus, but for this ineffectiveness, the outcome would have been different.

The Commonwealth notes counsel cannot be deemed ineffective merely for not calling a witness who would offer conflicting expert testimony, and the absence of such testimony did not prejudice appellant. It further rejects the three experts offered by appellant, noting the PCRA court found Dr. Libby and Dr. Mueller not credible. As for Dr. Eggleston, the Commonwealth claims her testimony would not have been credible because she vouched for Dr. Halverson and thus would not have testified at trial that Dr. Halverson's methodologies were flawed or she was not qualified.

The PCRA court denied relief, concluding appellant failed to prove counsel was ineffective and the outcome would have been different. The court determined Dr. Halverson was qualified to testify at trial as a canine DNA expert; thus, it rejected

---

[11] We reject appellant's claims that counsel was ineffective for failing to call Dr. Libby and Dr. Mueller as expert witnesses. Appellant does not argue — and likewise the PCRA hearing record does not support the premise — that such witnesses were available or that counsel was aware of or had a duty to know of the witnesses. See Chmiel, at 1143 (stating to establish ineffectiveness for failing to call expert witness, appellant must demonstrate expert existed and was available).

appellant's claim that counsel was ineffective for failing to challenge her qualifications, as that challenge would have been futile. PCRA Court Opinion, 3/27/12, at 27-28. Regarding admissibility of the canine DNA evidence, the court held the evidence was reliable and admissible, noting both Dr. Halverson and Dr. Eggleston testified at the PCRA hearings that canine DNA evidence was not novel at the time of appellant's trial. Id., at 29. The court explained although their testimony demonstrated a difference of expert opinion, which does not require the exclusion of evidence, it did not prove Dr. Halverson's methodology was flawed. Id., at 30, 34 n.21.

Additionally, the court rejected appellant's claims that counsel was ineffective for failing to present a defense DNA expert and sufficiently cross-examine Dr. Halverson and Dr. Basten. Id., at 30-33. After reviewing Dr. Eggleston's testimony from the PCRA hearings, the court reasoned that, because she had "vouched for [Dr.] Halverson's testing procedure and [Dr.] Halverson's qualifications to conduct the test[,]" Dr. Eggleston placed counsel "in the unenviable position of having to virtually concede the strength of the Commonwealth's canine DNA evidence." Id., at 31-33. The court highlighted that Dr. Eggleston did not refer counsel to any other expert who might assist him. See id., at 32.[12] As to counsel's failure to request a Frye hearing, the court determined the request would have been futile, for the same reasons explained above. See PCRA Court Opinion, 3/27/12, at 33.

---

[12] The court did not find Dr. Libby credible because his opinion was predicated on information that did not exist at the time of trial, he never attempted to validate Dr. Halverson's markers, and he had limited knowledge in the canine DNA evidentiary field. See id., at 32 n.20. The court rejected Dr. Mueller's testimony for similar reasons. See id., at 34 n.21. We are bound by the PCRA court's supported credibility determinations. See Dennis, at 305 (citations omitted).

"If a [PCRA] petitioner fails to satisfy any prong of the ineffectiveness inquiry, a claim of ineffective assistance of counsel will be rejected." Commonwealth v. Eichinger, 108 A.3d 821, 830-31 (Pa. 2014) (citation omitted); see also Commonwealth v. Albrecht, 720 A.2d 693, 701 (Pa. 1998) ("If it is clear that [a]ppellant has not demonstrated that counsel's act or omission adversely affected the outcome of the proceedings, the claim may be dismissed on that basis alone and the court need not first determine whether the first or second prongs have been met." (citation omitted)). Thus, even if we assume there is arguable merit to appellant's claims and counsel had no reasonable basis for failing to challenge the Commonwealth's canine DNA evidence, appellant is not entitled to relief because he failed to demonstrate the outcome of the guilt phase would have been different had the canine DNA evidence been excluded from his trial.[13]

Evidence of appellant's comprehensive preparatory activities was extensive. One month before the fire, he purchased straw on four separate occasions, along with two five-gallon gas cans, and he bought gasoline on two separate occasions the day of the fire — straw, gasoline, and two five-gallon gas cans were recovered at the fire's points of origin. During that month, he also changed his automobile comprehensive deductible to cover his vehicle if destroyed by fire — notably, he did not alter his collision insurance. Further, he tried to increase the limits on his homeowner's insurance and sought to purchase life insurance on Jessica, naming himself as beneficiary. A few days before

---

[13] Appellant rightly notes the prosecutor made public statements after trial, touting the significance of canine DNA on national television when appellant's case was profiled on the Animal Planet Media Network television show "Animal Witness." One must surmise the nature of this evidence was sufficiently novel to warrant the interest of national media; were the novel evidence deemed less important to the case, it would not make an important story, and the prosecutor would lose the opportunity to wax eloquent on national television. In any case, whether the prosecutor's televised comments comport with the actual contribution of the evidence does not matter — the remainder of the evidence is overwhelming to the point that prejudice is not made out.

the fire, he affixed a chain ladder to the residence as a means of escape. The jury heard testimony that appellant, on two separate occasions, discussed his plans to kill Jessica to avoid paying child support, stating he would use rope, gasoline, straw, and candles to start a fire in the home. Evidence established the security system had been disabled and the fire was started by using clothing, gasoline, straw, and candles.

Four days before the fire, appellant requested a survey of his home from ADT Security Services, expressing it was urgent. He told the ADT employee he knew how to disable his home security system and said a fire may start in his home in a few days, indicating its likely points of origin — the same areas as the origin of the fire four days later. Because appellant told the employee about the threatening note and that a fire might soon occur, the employee offered to install camera equipment that day at no immediate cost, but appellant refused. Even though the employee explained she could place the cameras in any location appellant wished, he told her he didn't "think the camera is going to catch [any potential perpetrators] because they're going to come through the front door." N.T. Trial, 10/4/02, at 70. As the employee was leaving the home, appellant said to her that "if [she] had noticed that his home had burnt … in the paper that [she] would know that he wouldn't be needing [a security] system." Id., at 67.

Moreover, significant evidence concerning the threatening note itself was submitted to the jury. Earlier on the day the note was discovered, appellant called Ms. Riddle at work and told her someone was lurking around their house, yet he did not call the police at that time. Ms. Riddle did not initially notice the note on the mailbox when she arrived home; thus, appellant insisted they leave the home and visit his parents. When they left, Ms. Riddle noticed the note, and appellant made copies of it before calling police. When police arrived to investigate, appellant told police the doorbell rang earlier in the night but no one was there when he answered, and he saw the note affixed to the

mailbox at that time. Despite telling police he noticed the note on the mailbox earlier, appellant did not retrieve it at that time but instead waited until Ms. Riddle came home and discovered it.

Telling evidence of appellant's behavioral changes was also introduced at trial. Appellant implemented and enforced rules that shoes not be worn in the home, and that bedroom doors be closed and locked. Significantly, on the night of the fire, appellant kept his shoes in his bedroom and his daughter's door was open. Appellant had previously forbidden his girlfriend to go to a local bar, once even threatening to burn it down if she went there again. On the day of the fire, however, appellant called her at least ten times, repeatedly urging her to go to the bar. Several witnesses testified appellant, before and after Jessica's death, was very calm and showed no emotion. Other witnesses, including Ms. Riddle and appellant's neighbor, stated he made no effort to assist rescuing Jessica, despite the facts that her bedroom was 11 feet away from his and, regarding Jessica's fire escape, that he previously told Ms. Riddle he could easily get to her bedroom by breaking a wall in a bathroom that separated their bedrooms. The jury also heard testimony that appellant referred to his deceased daughter as "it" during funeral arrangements and, while she was burning inside the home, stated, "'[T]he firemen will get her. She's probably dead anyway[,]'" and "'it's probably too late anyway.'" N.T. Trial, 9/30/02, at 97, 242.

Given the overwhelming circumstantial evidence of appellant's guilt, it is difficult to believe the outcome of the proceedings would have been different but for counsel's failure to challenge the canine DNA evidence.[14]   See Commonwealth v. Philistin, 53

---

[14] Parenthetically, the canine DNA evidence appears to be of unnecessary evidentiary value at best; while it is easy to second-guess the prosecutor's decision to pursue this evidence after the verdict is in, it could fairly be described as excess. This is so because there was an abundance of other unimpeachably incriminating evidence presented at (continued…)

A.3d 1, 10 (Pa. 2012) (stating counsel presumed effective, and appellant must overcome such presumption by proving prejudice, i.e., reasonable likelihood outcome would have been different but for counsel's alleged ineffectiveness (citations omitted)). Accordingly, we conclude appellant's claims regarding counsel's ineffectiveness for not challenging the Commonwealth's canine DNA evidence fail for lack of prejudice.

**Issue III:  Counsel's Failure to Investigate and Present Evidence to Contradict the Commonwealth's Theory**

Appellant claims trial counsel was ineffective for failing to investigate and present evidence contradicting the Commonwealth's theory of the case, i.e., that appellant committed the arson and murder because: (1) he was in financial distress; (2) he would profit by collecting insurance money and rebuilding the home himself;[15] and (3) he was unwilling to pay child support.

### A.  Counsel's failure to present financial expert

Appellant asserts trial counsel was ineffective for failing to consult with a financial expert and call such an expert at trial to rebut the Commonwealth's evidence of his financial status and theories of appellant's motives. The Commonwealth asserts counsel had a reasonable basis for not consulting with or calling a financial expert to

---

(…continued)
trial, such that the absence of canine DNA evidence would not have led to a different verdict — hence, appellant cannot establish the third prong necessary for relief.

[15] As to the Commonwealth's claim appellant could have benefitted from the fire by pocketing the insurance proceeds and rebuilding his home himself, appellant argues counsel should have presented evidence he was physically incapable of rebuilding the home. The PCRA court determined appellant's claim was speculative, underdeveloped, and contrary to the evidence presented, noting appellant, around the time of the fire, maintained his rental properties and competed in competitive powerlifting. The court concluded counsel was not ineffective in failing to portray appellant as feeble, as such a decision would have been futile. PCRA Court Opinion, 3/27/12, at 71 n.32. We agree and thus find appellant's contention meritless.

testify, noting he testified at the PCRA hearing: (1) appellant was the best source to assess his own finances; (2) he felt making a common-sense argument at trial that appellant would not have benefitted financially from the fire was sufficient and the evidence would have established the same; and (3) because the Commonwealth had a rebuttal financial expert prepared to testify, he thought it would have been futile to create a battle between experts.

At trial, the Commonwealth established appellant unsuccessfully attempted to borrow money and kept poor financial records, implying he set fire to his home to relieve himself from financial hardship. At the PCRA evidentiary hearings, appellant presented testimony from Kenneth McCrory, a forensic accountant, who opined appellant was financially sound, making financial gain an unlikely motive for arson. N.T. PCRA Hearing, 8/12/09, at 178. Specifically, Mr. McCrory stated appellant had personal equity of approximately $250,000, and his child-support payments of $3,000 per year were not a significant strain on his income. Id., at 189, 212. On cross-examination, he noted appellant's expenses and bills included: $90,000 per year on his mortgages;[16] a credit-card balance of approximately $30,000; utility bills of approximately $20,000; $1,000 per month to his ex-wife as part of their divorce settlement (which included child support); and approximately $13,000 in miscellaneous expenses. Id., at 215-23.

The PCRA court mentioned appellant's personal equity involved no liquid assets and concluded, "Had Mr. McCrory testified at trial, he would not have refuted the evidence that showed that [appellant] had significant expenses and little in the way of liquid assets." PCRA Court Opinion, 3/27/12, at 69-70. It also found credible the Commonwealth's PCRA expert who testified appellant's bank-account balances had significantly decreased weeks before the fire, his debt-to-income ratio supported banks denying him

---

[16] As previously noted, appellant owned and maintained various rental properties.

loans, and he would have made approximately $140,000 from insurance proceeds as a result of the fire but only $24,000 in profit if he sold the home. See id., at 70-71. The court cited counsel's reason for not presenting a financial expert — he felt the Commonwealth could not establish a strong financial motive and there was no benefit "to get into this sort of tit for tat[.]" Id., at 71 (quoting N.T. PCRA Hearing, 8/10/09, at 98). Determining a "battle of the experts" would not have rebutted the Commonwealth's motive theories and instead would have likely elicited more prejudicial evidence against appellant, the court concluded counsel had a reasonable basis in not presenting a financial expert and appellant failed to establish prejudice. Id., at 71-72.

In Chmiel, this Court explained:

> Where a claim is made of counsel's ineffectiveness for failing to call witnesses, it is the appellant's burden to show that the witness existed and was available; counsel was aware of, or had a duty to know of the witness; the witness was willing and able to appear; and the proposed testimony was necessary in order to avoid prejudice to the appellant. The mere failure to obtain an expert rebuttal witness is not ineffectiveness. Appellant must demonstrate that an expert witness was available who would have offered testimony designed to advance appellant's cause. Trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony. Additionally, trial counsel will not be deemed ineffective for failing to call a[n] … expert merely to critically evaluate expert testimony [that] was presented by the prosecution. Thus, the question becomes whether or not [defense counsel] effectively cross-examined [the Commonwealth's expert witness].

Chmiel, at 1143 (internal quotations marks and citations omitted).

We hold the PCRA court's conclusions are free from legal error and supported by the record. Apart from the fact that appellant failed to demonstrate Mr. McCrory was known at the time of trial or should have been known to counsel, it is unlikely the expert would have established appellant was financially sound, as Mr. McCrory would not have refuted appellant's substantial expenses and lack of liquid assets. Further, expert testimony on appellant's financial status was unnecessary, particularly where counsel

cross-examined the Commonwealth witnesses in an effective manner. Additionally, appellant does not explain how he was prejudiced particularly by the failure to present a financial expert, but instead argues he was collectively prejudiced by counsel's failure to call a multitude of experts. See infra, Issue X. Therefore, we reject this claim.

### B. Counsel's failure to question appellant's family-law attorney

Although appellant acknowledges trial counsel called Attorney Kelly Mroz, his family-law attorney, as a defense witness at trial, he contends counsel was ineffective in failing to question Attorney Mroz about his financial status. In particular, he asserts Attorney Mroz analyzed his finances and, if properly questioned by counsel, would have testified appellant did not desire to reduce his child-support payments and had a considerable monthly income.

The Commonwealth, on the other hand, asserts Attorney Mroz had limited knowledge regarding appellant's mortgages and bills; thus, it contends, counsel elicited as much beneficial testimony from Attorney Mroz as she had to offer.

Attorney Mroz testified she was retained by appellant to represent him in a custody matter regarding Jessica. N.T. Trial, 10/4/02, at 209-10. Attorney Mroz stated that a few months before the fire, appellant sought a custody modification to increase his visitation time with Jessica. Id., at 210-13. At the PCRA hearings, Attorney Mroz knew minimal information concerning appellant's financial status. She had appellant's bank-account statements and information on occupancy and monthly rent for his apartments, but she was unaware of appellant's overall financial status, the mortgages on his properties, and his monthly bills and expenses. N.T. PCRA Hearing, 7/7/09, at 87-88.

The PCRA court concluded appellant's contention lacked arguable merit, as Attorney Mroz would not have supported appellant's claim that he was financially sound.

PCRA Court Opinion, 3/27/12, at 72. We agree and find appellant's claim meritless. His family-law attorney, who he retained solely to handle a petition to modify his custody and visitation of Jessica, had limited knowledge about his finances. Accordingly, appellant is not entitled to relief on this claim.

### C. Counsel's failure to impeach tax preparer with crimen falsi

Appellant claims trial counsel unreasonably failed to investigate and impeach Ella Alloway, appellant's tax preparer, based on her crimen falsi and bias in favor of the prosecution. He argues a proper investigation of Ms. Alloway would have uncovered her legal and financial obligations to the Commonwealth as a result of her forgery conviction, and counsel was ineffective in failing to uncover this crimen falsi conviction and use it to impeach her.

The Commonwealth responds appellant did not suffer prejudice by any lack of impeachment, as Ms. Alloway's testimony supported the possibility appellant received a legitimate threat of arson. It notes Ms. Alloway testified the documents appellant submitted for tax-return preparation lacked sufficient detail, and she did not opine on appellant's financial status.

Ms. Alloway testified at trial that she prepared appellant's tax returns from 1996 to 2000 and he poorly maintained his financial records. N.T. Trial, 10/4/02, at 136, 138-39. She also testified appellant — one week before the fire — brought her a box of financial records and asked her to store them, which is something she often did for clients. Id., at 141-44. Appellant asked her for information about his homeowners and auto insurance the day after the fire. Id., at 142-43. On cross-examination, trial counsel elicited testimony that appellant gave Ms. Alloway sufficient information to prepare his tax returns. Id., at 145. Counsel also questioned Ms. Alloway about the box appellant gave her. Ms. Alloway disclosed appellant told her he was concerned because of a

threatening note he received, which prompted him to bring her the box of records. Id., at 145-46.

The PCRA court rejected appellant's ineffectiveness claim, determining he would have lost the benefit of the favorable inferences elicited by counsel on cross-examination had counsel impeached Ms. Alloway with her crimen falsi. PCRA Court Opinion, 3/27/12, at 73. The court reasoned that using Ms. Alloway's convictions against her would have demonstrated appellant's taxes were prepared by a convicted forger. Id.

Evidence of a witness's conviction for a crime involving dishonesty or a false statement is generally admissible. Pa.R.E. 609(a). "A failure to so impeach a key witness is considered ineffectiveness in the absence of a reasonable strategic basis for not impeaching." Commonwealth v. Small, 980 A.2d 549, 565 (Pa. 2009) (citation omitted). We agree with the PCRA court that counsel acted reasonably in declining to impeach Ms. Alloway, as impeaching her would have discredited favorable testimony, i.e., her corroboration of the defense's theory that someone else committed the arson. Accordingly, we reject appellant's claim for his failure to establish the reasonable basis prong of the ineffectiveness test.

**Issue IV:   Counsel's Failure to Impeach Mr. Pianta and Request "Corrupt Source" Instruction**

Appellant contends trial counsel was ineffective for failing to impeach Mr. Pianta, particularly with evidence of his reputation for dishonesty, crimen falsi juvenile adjudication, use of aliases, bias, and mental health. He also argues counsel should have requested a corrupt-source instruction because Mr. Pianta was an accomplice.

**A.   Counsel's failure to present evidence of Mr. Pianta's reputation for dishonesty**

Appellant claims Mr. Pianta had a reputation for being a thief and a liar, and each of the five character witnesses appellant proffered at the PCRA hearings testified to his

reputation for dishonesty. Appellant asserts trial counsel had no reasonable basis for failing to call character witnesses and he was prejudiced because Mr. Pianta was a crucial Commonwealth witness who divulged appellant's plan to commit the arson and murder, thereby establishing intent and premeditation. The Commonwealth avers appellant failed to establish counsel knew or should have known of all the proffered witnesses except for Sally Owen, an aunt of the mother of Mr. Pianta's child. As to Ms. Owen, the Commonwealth posits her testimony would not have been admissible because she only testified to specific instances of conduct and not reputation.

The PCRA court rejected appellant's ineffectiveness claims, determining the witnesses' declarations related to specific instances of Mr. Pianta's conduct, which are inadmissible under Pa.R.E. 608,[17] rather than his reputation for dishonesty. PCRA Court Opinion, 3/27/12, at 60-62. The court also concluded most of the testimony appellant presented did not relate to Mr. Pianta's reputation at the time of trial. Id.

We conclude the PCRA court's findings are supported by the record and free of legal error. The testimony appellant presented primarily addressed Mr. Pianta's specific instances of conduct, i.e., specific acts of theft and lying, which would have been inadmissible to attack his credibility under Pa.R.E. 608(b)(1). Further, except for Ms. Owen — whose declarations only cited Mr. Pianta's specific instances of conduct — appellant failed to establish the witnesses were known or should have been known to counsel. See Chmiel, at 1143 (stating to prevail on ineffectiveness claim for failure to call witness, appellant must prove: (1) witness existed; (2) witness was available; (3) trial counsel knew or should have known of witness's existence; (4) witness was prepared to

---

[17] "[T]he character of a witness for truthfulness may not be attacked or supported by cross-examination or extrinsic evidence concerning specific instances of the witness' conduct[.]" Id., 608(b)(1).

cooperate and would have testified on appellant's behalf; and (5) absence of testimony prejudiced appellant).   Accordingly, this claim fails.

### B.   Counsel's failure to cross-examine Mr. Pianta with crimen falsi

Appellant claims trial counsel was ineffective for failing to cross-examine Mr. Pianta concerning his crimen falsi juvenile adjudication.   The Commonwealth asserts counsel had a reasonable basis for believing Mr. Pianta's juvenile adjudication would not have been helpful, appellant failed to establish he was prejudiced by counsel's lack of cross-examination, and the PCRA court's decision was supported by the record and legally correct.

Mr. Pianta, who was 23 years old when he testified at trial, was adjudicated delinquent for theft, unauthorized use of a motor vehicle, criminal mischief, and driving without a license when he was 17.   Counsel stated at the PCRA hearings that he did not use Mr. Pianta's crimen falsi adjudication because he felt it involved minor offenses and thus was insignificant.   N.T. PCRA Hearing, 8/10/09, at 23.   The PCRA court held, regardless of the minor nature of the offenses, counsel lacked a reasonable basis not to cross-examine Mr. Pianta based on his crimen falsi adjudication.   PCRA Court Opinion, 3/27/12, at 63.   However, the court determined appellant was not prejudiced because there was no way to demonstrate what impact this adjudication would have on the jury or that the outcome of the trial would have been different.   Id.

We agree that appellant has failed to establish the prejudice prong of the ineffectiveness test.   Appellant only argues he was cumulatively prejudiced by counsel's failure to impeach Mr. Pianta with evidence of his reputation for dishonesty, crimen falsi, use of aliases, bias, and mental-health records.   He asserts Mr. Pianta's credibility could have been significantly undermined had counsel not committed the combined errors in cross-examining him.   Yet, because he does not explain how he was prejudiced

specifically by counsel's failure to utilize Mr. Pianta's juvenile adjudication, we decline to deem counsel's performance constitutionally deficient.

### C. Counsel's failure to present evidence of Mr. Pianta's use of aliases

Next, appellant submits trial counsel was ineffective for not cross-examining Mr. Pianta as to his use of aliases. Appellant asserts Mr. Pianta's use of deception was relevant to his reliability and counsel had no reasonable basis for failing to cross-examine him on this basis. The Commonwealth offers no argument on this particular issue, only reiterating appellant failed to demonstrate prejudice and the PCRA court did not err.

The PCRA court concluded Mr. Pianta's use of aliases would not have been admissible at trial. Id. We conclude appellant has failed to establish entitlement to relief on this claim. His scant argument lacks arguable merit, contains a bald allegation that counsel was unreasonable, and offers no explanation as to how he was prejudiced. See Commonwealth v. Walter, 966 A.2d 560, 566 (Pa. 2009) (holding claims waived for failure to develop them).

### D. Counsel's failure to elicit evidence of Mr. Pianta's bias

Appellant avers trial counsel failed to cross-examine Mr. Pianta on alleged favorable treatment he received from the Commonwealth because he, at one point, had been investigated by police for the arson. He also asserts Mr. Pianta had outstanding charges at the time of trial. Moreover, appellant argues Mr. Pianta's bias by testifying for and currying favor with the Commonwealth was sufficient grounds to cross-examine him, and counsel had no reasonable basis for failing to do so.

The Commonwealth replies there was no evidence of favorable treatment and thus counsel's reasons for not cross-examining Mr. Pianta were legitimate. As to Mr. Pianta's outstanding charges, the Commonwealth asserts they would have been inadmissible under Pa.R.E. 609 because they are not convictions.

The PCRA court held this claim lacked merit because appellant failed to introduce any evidence of Mr. Pianta's favorable treatment by the Commonwealth. PCRA Court Opinion, 3/27/12, at 63. We likewise find appellant's ineffectiveness contention meritless, as he fails to provide any support for Mr. Pianta's alleged favorable treatment in the police's arson investigation. As to appellant's claim that Mr. Pianta had outstanding charges at the time of trial, the charges would have been inadmissible because they were not actual convictions. See Pa.R.E. 609. Because appellant fails to demonstrate arguable merit, we reject his ineffectiveness claims as to counsel's failure to challenge Mr. Pianta's alleged bias.

### E. Counsel's failure to cross-examine Mr. Pianta regarding his juvenile file

Appellant contends trial counsel was ineffective for failing to review and present evidence of Mr. Pianta's juvenile file, which the PCRA court sealed because it contained mental-health records. The Commonwealth makes no contention regarding this particular matter.

The PCRA court found nothing in the file would have been admissible for Mr. Pianta's competency or for any other reason. PCRA Court Opinion, 3/27/12, at 64. Thus, it concluded appellant's claim lacked arguable merit. Id. The PCRA court's findings are supported by the record and free of legal error. Our review of the record demonstrates any evidence in Mr. Pianta's juvenile file relevant to his credibility would be inadmissible as specific instances of conduct, see Pa.R.E. 608(b)(1), and none of the information involved Mr. Pianta's credibility at the time of trial. Hence, appellant's ineffectiveness claim fails.

### F. Counsel's failure to request a corrupt-source instruction

Appellant argues trial counsel was ineffective for failing to request a corrupt-source instruction in connection with Mr. Pianta's testimony. He maintains he was entitled to a

corrupt-source charge because there was sufficient evidence to present a question to the jury concerning whether Mr. Pianta was an accomplice. He asserts counsel's belief the request would have been futile is insufficient and unreasonable. As to prejudice, he only claims "there is a reasonably [sic] likelihood th[e] jurors would have accorded less weight to Pianta's testimony over-all. Confidence in the outcome is undermined." Appellant's Brief, at 31.

In response, the Commonwealth argues there was no evidence presented at trial from which the jury could have reasonably inferred Mr. Pianta was appellant's accomplice. It claims the fact Mr. Pianta had been investigated by police at one point is not dispositive of whether he was an accomplice. The Commonwealth asserts, in light of the lack of evidence, counsel's decision to forego a corrupt-source instruction was reasonable.

The PCRA court held a corrupt-source instruction was not supported by the evidence admitted at trial. PCRA Court Opinion, 3/27/12, at 66. Further, the court noted, painting Mr. Pianta as an accomplice would have contradicted appellant's defense theory that the arson was committed by some unknown intruder. Id., at 66-67.

"[I]t 'is well established that, in any case in which an accomplice implicates the defendant, the [judge] should instruct the jury that the accomplice is a corrupt and polluted source whose testimony should be considered with caution.'" Commonwealth v. Hanible, 30 A.3d 426, 462 (Pa. 2011) (citation omitted). A corrupt-source instruction is warranted where sufficient evidence is presented as to whether the witness is an accomplice. Commonwealth v. Williams, 732 A.2d 1167, 1181 (Pa. 1999). An individual is an accomplice if, with intent to promote or facilitate the commission of the offense, he solicits, aids, agrees, or attempts to aid another person in planning or committing the offense. 18 Pa.C.S. § 306(c)(1).

The record supports the PCRA court's finding appellant failed to demonstrate entitlement to relief. There was no evidence Mr. Pianta was an accomplice to the arson or the murder. Mr. Pianta lived in one of appellant's apartments and would work for him in lieu of rent. He had been to appellant's home a few times to retrieve tools or help with work, but he never stayed overnight or had been there for more than a few hours. Mr. Pianta stated he accompanied appellant twice on trips to pick up Jessica from her mother's home, and on both occasions, appellant discussed his intent to commit the murder. These trips took place the week of the fire and about one month before the fire. Appellant told Mr. Pianta he wanted to avoid paying child support and wished to kill his other daughter as well. According to Mr. Pianta, appellant did not ask for his help, and he did not offer assistance. Mr. Pianta mentioned he had spread straw around appellant's backyard because it was muddy. He also testified that, a few days before the fire, he affixed the chain ladder to appellant's home per appellant's request. Mr. Pianta said he was not at appellant's home on the day of the fire.

Mr. Pianta's prior knowledge of appellant's possession of straw and the fact Mr. Pianta attached the chain ladder to appellant's home is insufficient to support an accomplice instruction. Mr. Pianta's testimony was not contradicted, and there was no evidence he took part in appellant's crimes. Because appellant was not entitled to a corrupt-source instruction, his ineffectiveness claim fails for lack of arguable merit. Moreover, as the PCRA court pointed out, we see no reason why counsel would have requested an instruction that Mr. Pianta is a corrupt and polluted source — whose testimony should not be believed because he helped appellant plan and commit the arson and murder — because counsel's defense strategy was to blame the arson on an unknown intruder.

**Issue V:   Inaccurate and Unreliable Testimony**

Appellant claims his conviction violated due process because Mr. Pianta's testimony was inaccurate and unreliable.   Appellant bases his claim on an opinion expressed by a prosecutor who handled Mr. Keith's guilty plea.   Specifically, appellant claims the prosecutor for Mr. Keith's plea made statements to the media and at Mr. Keith's plea hearing that established the inaccuracy and unreliability of Mr. Pianta's testimony.

The Commonwealth argues appellant's claim is waived because he did not raise it on direct appeal.   Even had appellant not waived his contention, the Commonwealth continues, the prosecutor's personal opinion was inadmissible and did not constitute Brady material, especially due to the fact the prosecutor was not involved in appellant's case, as the prosecutor was a local assistant district attorney and appellant's trial was handled by the Pennsylvania Attorney General.

As the PCRA court properly held, appellant's allegation of trial court error is waived for failure to raise it on direct appeal.   See 42 Pa.C.S. § 9544(b).   Furthermore, the PCRA court determined, despite waiver, appellant's contention lacked merit.   After appellant was sentenced, Mr. Keith pled guilty to hindering apprehension or prosecution, and charges for conspiracy to commit arson and murder were dropped.   The prosecutor — an Erie County Assistant District Attorney[18] — was quoted in a newspaper article explaining one reason for agreeing to Mr. Keith's guilty plea was due to "what happened in [appellant's] case and the problems we know to exist with the testimony of [] Pianta[.]"

---

[18] This is significant because appellant was prosecuted by the Pennsylvania Attorney General.   The prosecutor in Mr. Keith's case was not involved in appellant's case. Notably, the prosecutor also was not involved in negotiating Mr. Keith's plea; the plea was already agreed to, and his assignment was to take the plea and give reasons for the plea to the court, which were conveyed to him by the District Attorney at that time.   See N.T. PCRA Hearing, 8/4/11, at 6-7.

<u>Id.</u>, at 18. He made a similar statement to the court during Mr. Keith's guilty-plea hearing. The prosecutor explained conspiracy charges against Mr. Keith were not pursued because the conspiracy charges were withdrawn against appellant. <u>Id.</u>, at 11. He also explained he knew nothing about appellant's trial or whether Mr. Pianta even testified at appellant's trial; rather, he merely relayed to the court during Mr. Keith's guilty plea the reasons conveyed to him by the District Attorney. <u>See</u>, <u>e.g.</u>, <u>id.</u>, at 11, 13.

Even if appellant preserved his claim — which he did not — we hold he fails to demonstrate arguable merit and prejudice, as Mr. Keith's plea took place after appellant was sentenced and the jury at his trial was free to reject Mr. Pianta's testimony if he was found to be unreliable.

**Issue VI:   Brady Claims**

Appellant claims the Commonwealth violated <u>Brady</u> by precluding him from presenting testimony from Mr. Keith and withholding evidence that police provided housing to Mr. Pianta. To establish a <u>Brady</u> violation, appellant must demonstrate: (1) the prosecution concealed evidence; (2) the evidence was either exculpatory or impeachment evidence favorable to him; and (3) he was prejudiced. <u>Chmiel</u>, at 1130 (quoting <u>Commonwealth v. Paddy</u>, 15 A.3d 431, 450 (Pa. 2011)). To establish prejudice, appellant must demonstrate a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Commonwealth v. Burke</u>, 781 A.2d 1136, 1141 (Pa. 2001). "'Impeachment evidence[,] which goes to the credibility of a primary witness against the accused[,] is critical evidence and it is material to the case whether that evidence is merely a promise or an understanding between the prosecution and the witness.'" <u>Chmiel</u>, at 1131 (quoting <u>Commonwealth v. Strong</u>, 761 A.2d 1167, 1175 (Pa. 2000)). "However, mere conjecture as to an understanding is not sufficient to establish a <u>Brady</u> violation." <u>Id.</u> (citation

omitted).  Finally, we note "[t]here is no Brady violation when the appellant knew or, with reasonable diligence, could have uncovered the evidence in question[.]"  Paddy, at 451.

### A.  Mr. Keith's testimony

Appellant argues Mr. Keith was a critical defense witness and the Commonwealth influenced Mr. Keith to invoke his Fifth Amendment rights on the stand at appellant's trial, which was evinced from the fact — as explained above — Mr. Keith was permitted to plead guilty to hindering apprehension in exchange for withdrawal of conspiracy charges. Appellant alleges the Commonwealth had a quid pro quo deal with Mr. Keith that if he invoked his Fifth Amendment rights at appellant's trial, he would receive the aforementioned plea deal.  The Commonwealth contends there was no evidence of any discussion of a deal.  The Commonwealth explains it in no way deprived appellant of Mr. Keith's testimony; rather, Mr. Keith invoked his rights at appellant's trial solely on the advice of counsel.

The PCRA court rejected appellant's Brady claim, finding Mr. Keith invoked his Fifth Amendment rights at appellant's trial because he was acting on advice of counsel, not because the Commonwealth deterred him from testifying.  PCRA Court Opinion, 3/27/12, at 56.  Thus, because Mr. Keith was an unavailable witness to both appellant and the Commonwealth, the court held no Brady violation occurred.  Id.

Preliminarily, we note appellant fails to indicate when or how he became aware of the alleged Brady material, i.e., Mr. Keith's guilty plea, which appears to have been available at the time of his post-sentence motions or direct appeal.  He fails to offer any explanation as to why this information could not have been obtained earlier with the exercise of due diligence.  See 42 Pa.C.S. § 9545(b)(2).  Accordingly, appellant's Brady claim is waived because it could have been raised in an earlier proceeding.  See id., § 9544(b); see also Chmiel, at 1129-30 (concluding appellant's Brady claim concerning

alleged deal between prosecutor and two material witnesses was waived for failure to have raised it in earlier proceeding (citations omitted)); Commonwealth v. Bomar, 104 A.3d 1179, 1190-91 (Pa. 2014) (finding Brady claim waived where appellant did not show information was not available at trial or counsel could not have uncovered it with reasonable diligence), petition for cert. filed (U.S. May 6, 2015) (No. 14-9649). However, because the Commonwealth does not argue waiver, we will address the claim on the merits.

In October, 2001, Mr. Keith pled guilty to conspiracy to commit murder and arson, and he was awaiting sentencing. N.T. PCRA Hearing, 7/7/09, at 7. In September, 2002, one month before appellant's trial commenced, Ms. Riddle called Attorney Charbel Latouf and requested he represent Mr. Keith for the purpose of withdrawing his guilty plea. Id., at 5-7. Attorney Latouf entered his appearance and filed a motion to withdraw Mr. Keith's guilty plea September 17, 2002. Id., at 9. Attorney Latouf testified he advised Mr. Keith to invoke his Fifth Amendment rights at appellant's trial and not testify. Id., at 11. As Mr. Keith invoked his rights at appellant's trial, he was unavailable as a witness. Minutes before the hearing on Mr. Keith's motion to withdraw his guilty plea — which occurred after appellant was convicted and sentenced — the prosecution offered to withdraw all remaining charges in exchange for Mr. Keith's guilty plea to hindering apprehension of a witness, to which he agreed. Id., at 16-18.

The record supports the PCRA court's finding that Mr. Keith invoked his Fifth Amendment rights at appellant's trial based solely on counsel's advice. Attorney Latouf testified, once the guilty-plea-withdrawal motion was filed, neither he nor Mr. Keith cooperated with the Commonwealth or the defense, and the only favorable treatment Mr. Keith received from the Commonwealth came at the hearing on the motion subsequent to appellant's trial. See id., at 12-22. As explained above, the Commonwealth offered the

plea to Mr. Keith in light of the evidence elicited at appellant's trial, not in exchange for Mr. Keith's invocation. Because the record supports the factual finding that no agreement existed, appellant's claim lacks merit, as he has failed to establish the Commonwealth did not disclose exculpatory or impeaching evidence.

## B. Evidence showing police provided Mr. Pianta witness protection

It is undisputed police housed Mr. Pianta and his girlfriend in a local motel for approximately one month during March and April, 2001, costing approximately $525. Appellant claims the Commonwealth violated Brady by failing to disclose this evidence. He asserts the evidence was material to his defense by undermining Mr. Pianta's credibility. The Commonwealth argues this information was immaterial and, had it been disclosed, would have been harmful and prejudicial to appellant because Mr. Pianta was housed due to his fear of appellant and because he rented an apartment from appellant. Therefore, as the evidence would have led the jury to infer appellant would retaliate against individuals who testified against him, the Commonwealth contends the information was not favorable to appellant and thus not Brady material.

The PCRA court held appellant's claim did not amount to a Brady violation because Mr. Pianta's living arrangements were not used as inducement or payment in exchange for his testimony; rather, Mr. Pianta was housed because he feared appellant and police wished to keep him safe. PCRA Court Opinion, 3/27/12, at 56. We find the PCRA court's conclusion is supported by the record and free of legal error. Appellant fails to acknowledge Mr. Pianta was essentially placed in a witness-protection program because he feared appellant would retaliate after he implicated him in the arson and murder, especially due to the fact that, as his landlord, appellant knew where he lived and had access to his apartment. The challenged evidence was not material or helpful to appellant, as it would have raised the inference he would retaliate. Thus, we find

appellant's claim lacks merit, as the evidence would not have changed the result of appellant's trial in his favor and thus was not Brady material. See Commonwealth v. Birdsong, 24 A.3d 319, 327-28 (Pa. 2011) (stating Commonwealth's failure to disclose it placed witnesses in protection programs did not constitute material evidence). Accordingly, appellant's claim was properly rejected.

## Issue VII:   Trial Court's Failure to Voir Dire Jurors

During the guilt phase of appellant's trial, the court received a letter from a juror expressing concern about another juror's inappropriate behavior and comments at a restaurant.   The trial judge, in chambers and in the presence of all counsel, questioned court staff, the accused juror, and other jurors who interacted with the accused juror at the restaurant.   All parties agreed to dismiss the accused juror, and thus he was dismissed. The judge then returned to the courtroom and questioned the jury as a whole concerning its ability to remain fair and impartial; no juror indicated his fairness or impartiality had been affected.   Appellant's trial counsel did not object to the manner in which the court handled the issue with the accused juror.   See N.T. Trial, 10/4/02, at 3-41, 48-52.

Appellant now contends the court erred in failing to voir dire each juror individually. The Commonwealth asserts this issue is waived.   On the merits, it claims the trial court acted within its discretion and appellant fails to demonstrate prejudice.

As the PCRA court correctly concluded, appellant's claim is waived, not only because counsel failed to timely object but also because the allegation of trial court error was not raised on direct appeal.   See 42 Pa.C.S. § 9544(b).

## Issue VIII:   Counsel's Failure to Present Good Character Evidence

Appellant argues trial counsel was ineffective for failing to present evidence of his good character during the guilt phase of the trial, which could have raised reasonable doubt in the mind of the jury.   Specifically, appellant claims counsel failed to investigate and present evidence supporting his good reputation for being a peaceful, honest, and

law-abiding citizen. He also asserts counsel's explanation for not presenting good character evidence — that it would have evinced instances of appellant's misconduct involving prior arsons and theft — was unreasonable because he had no prior convictions. Thus, he concludes, any evidence of prior misconduct would have been barred on cross-examination.

The Commonwealth stresses trial counsel had a reasonable strategic basis for deciding not to call character witnesses, as appellant's evidence of good character was minimal and there was a strong likelihood of eliciting substantial evidence of bad character.

The PCRA court concluded counsel adequately explored the possibility of presenting character evidence and had a reasonable basis for not calling character witnesses. PCRA Court Opinion, 3/27/12, at 74. The court determined there was a substantial risk in presenting character evidence because it would have opened the door to specific instances of bad acts or criminal conduct, particularly appellant's involvement with approximately nine other arsons committed both as a juvenile and adult. Id. Thus, because counsel had a reasonable basis in deciding not to present good character evidence, the court held he was not ineffective. Id.

The failure to call character witnesses does not constitute per se ineffectiveness. Commonwealth v. Cox, 983 A.2d 666, 693 (Pa. 2009) (citation omitted). In establishing whether defense counsel was ineffective for failing to call witnesses, appellant must prove:

> (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

Commonwealth v. Puksar, 951 A.2d 267, 277 (Pa. 2008) (citation omitted).

Preliminarily, we note appellant has not identified or presented any potential character witnesses; this alone is grounds to deny relief. In addition, we conclude, as did the PCRA court, that after exploring the possibility of presenting good character evidence, counsel had a reasonable, strategic basis in not calling character witnesses. "While character witnesses may not be impeached with specific acts of misconduct, a character witness may be cross-examined regarding his or her knowledge of particular acts of misconduct to test the accuracy of the testimony." Id., at 281 (citation omitted). Counsel testified at the PCRA evidentiary hearings that appellant had minimal evidence of good character and substantial bad character evidence — specifically, the involvement in nine other fires, some of which were ruled as arsons — and he did not want to risk introduction of that evidence. Accordingly, trial counsel was not ineffective for failing to present good character evidence.

**Issue IX: Trial Court's Denial of Appellant's Request to Represent Himself**

Appellant alleges the trial court erred in denying his request to represent himself at the remainder of the guilt phase and the penalty phase. The Commonwealth notes the issue was previously litigated on direct appeal, and argues appellant's claim is nonetheless meritless because the right to self-representation is not absolute and the trial proceedings had nearly concluded at the time appellant made his request. Thus, it contends the trial court did not err in denying the request.

On the last day of the guilt phase, appellant expressed the desire to represent himself, and informed the court he was not attempting to delay the proceedings because he had his closing argument prepared that day and was ready to proceed. The trial court conducted a colloquy and denied the request, finding that allowing appellant to represent himself when the guilt phase was nearly complete would have confused the jury and caused disruption, inconvenience, and delay.

As the PCRA court correctly concluded, this issue has been previously litigated. See Treiber, at 32 (trial court did not abuse its discretion in denying appellant's request to represent himself); see also 42 Pa.C.S. § 9544(a)(2). Insofar as appellant alleges counsel failed to thoroughly advocate for his right to represent himself, his cursory claim of ineffectiveness is waived for failure to develop it in any meaningful fashion capable of review. See Walter, at 566 (holding claims waived for failure to develop them).

**Issue X:   Counsel's Failure to Investigate/Present Expert Evidence**

Appellant claims trial counsel was ineffective for failing to investigate, develop, and introduce expert testimony to contradict the Commonwealth's evidence, particularly experts regarding: (1) canine DNA evidence; (2) fire investigation; (3) appellant's indifferent demeanor; and (4) appellant's financial status. Because we have addressed appellant's issues as to canine DNA evidence and his financial status, see supra, Issues I-III, we will only address appellant's claims as to fire investigation and his indifferent demeanor.

### A.   Arson Expert

Appellant argues trial counsel was ineffective for failing to call David Redsicker, an arson expert, at trial to rebut the Commonwealth's arson testimony from a state fire marshal. While appellant acknowledges counsel consulted with Mr. Redsicker prior to trial, he asserts counsel was ineffective for not asking Mr. Redsicker a crucial question, i.e., whether a delay device was used in the arson. He also claims Mr. Redsicker would have testified the absence of detectible gasoline on appellant's clothes the night of the fire meant he did not pour gasoline that night.

The Commonwealth maintains counsel had a reasonable basis for not calling Mr. Redsicker, asserting there was no dispute the fire was an arson and Mr. Redsicker identified a third point of origin near Jessica's bedroom. It thus argues appellant suffered

no prejudice because Mr. Redsicker would not have offered helpful or additional information. The Commonwealth notes its theory at trial was that appellant used a delay device to start the fire to allow him to get away without injury, and Mr. Redsicker testified at the PCRA hearings that straw, candles, and gasoline could be used to create delay devices. The Commonwealth contends Mr. Redsicker's opinion that appellant must not have poured gasoline because he did not have it on his clothing was highly speculative. Nonetheless, the Commonwealth submits, the lack of such testimony did not prejudice appellant because it was undisputed gasoline was not found on his person and his counsel emphasized this fact during closing argument.

At trial, the Commonwealth offered testimony from the state fire marshal who examined the scene. He concluded there were two unconnected points of origin — one in the garage and the other in the basement — and straw, candles, and gasoline were used as delay devices to start the fire. Appellant's trial counsel consulted with Mr. Redsicker prior to trial but did not call him at trial as an expert witness because: (1) there was no dispute an arson was committed; (2) Mr. Redsicker believed appellant's basement window had been opened to provide oxygen and fuel the fire; and (3) there was a drawback to his testimony because he discovered a third point of origin outside Jessica's bedroom. See N.T. PCRA Hearing, 8/10/09, at 51-53. Mr. Redsicker testified at the PCRA hearings that he agreed with the fire marshal's conclusions as to the points of origin. N.T. PCRA Hearing, 8/11/09, at 60-61. Mr. Redsicker also disclosed counsel gave him the fire marshal's report to review; the report contained the fire marshal's opinion that delay devices were used, and the possibility that straw, gasoline, and candles were used as delay devices could not be ruled out. Id., at 76, 84.

The PCRA court held counsel made a reasonable, strategic choice not to call Mr. Redsicker due to the possibility he would indicate a third point of origin — which could

have hurt appellant — and it was reasonable for counsel to assume Mr. Redsicker had no dispute as to the use of delay devices, or he would have informed him of any disagreement with the fire marshal's conclusions. PCRA Court Opinion, 3/27/12, at 52-53. The court also concluded appellant failed to establish prejudice, as Mr. Redsicker's testimony at the PCRA hearings did not dispute the fire marshal's conclusions at trial. Id. The court discredited Mr. Redsicker's testimony that appellant could not have started the fire because there was no gasoline found on his clothing, finding such opinion purely speculative. Id.

As discussed supra, the mere failure to call an expert rebuttal witness is not per se ineffectiveness, and counsel need not introduce such expert if he effectively cross-examines the Commonwealth's witnesses and elicits helpful testimony. See Chmiel, at 1143 (citations omitted). Appellant fails to argue counsel's cross-examination of the fire marshal was inadequate. Our review of the record demonstrates counsel effectively cross-examined the fire marshal and elicited helpful testimony in support of the defense theory that an unknown intruder committed the arson. See N.T. Trial, 10/1/02, at 134-44 (questioning as to evidence of forced entry in home and possibilities that may have shown intruder committed arson). Thus, counsel was not ineffective.

We also conclude the PCRA court correctly determined appellant failed to establish the reasonable basis and prejudice prongs of the ineffectiveness test. As the court pointed out, Mr. Redsicker indicated a possible third point of origin located outside Jessica's bedroom. His testimony, therefore, would have diminished the defense's theory that an intruder committed the arson and supported the Commonwealth's theory that appellant burned the house to murder Jessica. Thus, counsel had a reasonable basis for not calling Mr. Redsicker. Moreover, appellant does not explain how counsel's failure to call Mr. Redsicker prejudiced him; he focuses only on the cumulative effect of

counsel's alleged errors, arguing counsel could have significantly weakened the Commonwealth's case by calling experts in canine DNA, mental health, arson, and accounting. Appellant claims, without support, that the outcome of the guilt phase would have been different had counsel offered this expert testimony and properly impeached the fire marshal. Accordingly, appellant fails to establish prejudice.

### B.   Mental-Health Expert

Numerous non-expert Commonwealth witnesses testified appellant lacked emotion at the time of the fire and after his daughter's death. Trial counsel attempted to rebut this testimony by presenting appellant's mother, who described appellant as generally unemotional and stated he had acted this way since he was a child, attributing his indifferent demeanor to a family trait. The PCRA court determined appellant failed to establish the reasonable basis and prejudice prongs of the ineffectiveness test.

Appellant argues counsel failed to investigate and present mental-health evidence to rebut the Commonwealth's non-expert testimony that he showed no emotion and lacked grief for his daughter's death. Specifically, appellant asserts he suffered brain damage from an accident approximately ten years before the fire. He posits that had counsel presented mental-health evidence, an explanation would have been provided to the jury that his indifferent demeanor or lack of emotion stemmed from his brain damage and mental-health issues, not from a desire to murder Jessica.

The Commonwealth argues counsel made a reasonable strategic decision not to present a mental-health expert in light of the pre-trial examination conducted by Steven Reilly, see infra, Issue XI, and appellant failed to show he was prejudiced by counsel's alleged ineffectiveness.

While appellant offers extensive argument as to counsel's ineffectiveness for failing to present mental-health evidence during the penalty phase, he makes only

cursory claims of ineffectiveness regarding the guilt phase, merely incorporating by reference the entirety of his penalty-phase contentions for support as to why counsel was ineffective in the guilt phase of his trial. Because he fails to explain why counsel had no reasonable basis for his guilt-phase decisions or how the outcome would have been different, his guilt-phase issue is waived as underdeveloped. See Walter, at 566 (holding claims waived for failure to develop them).

## II. PENALTY-PHASE CLAIMS

### Issue XI: Counsel's Failure to Investigate/Present Mitigating Evidence

Appellant claims trial counsel was ineffective for failing to investigate and present penalty-phase mitigating evidence of appellant's medical, psychological, and sociological history, and his good behavior in prison. He maintains counsel's decision to abandon presenting evidence of his psychological and sociological problems in favor of a "life is worse than death" argument was an irrational strategy. Appellant argues had counsel conducted a reasonable investigation, he would have discovered compelling evidence warranting expert psychiatric and neuropsychological testimony to directly support the claim of neurological impairment and brain damage, which was submitted to the jury under the catch-all mitigator but not found. He alleges such expert testimony could have led to submitting additional mitigating circumstances to the jury under 42 Pa.C.S. §§ 9711(e)(2), 9711(e)(3).

Appellant asserts he had a brain injury from an accident in 1991 in which his car collided with a backhoe loader.[19] His medical history since the accident evinces he suffered from persistent cognitive impairments, and a Magnetic Resonance Imaging (MRI) test conducted in 1996 established he has brain damage. Appellant contends

---

[19] A backhoe loader is a tractor-like vehicle with a digging bucket on one end and a loading bucket on the other.

counsel failed to provide Steven Reilly — an expert forensic psychologist who counsel consulted with before trial to determine whether appellant had cognitive or mental impairments — with all of his records, including the results of his 1996 MRI. Had counsel properly provided all relevant background information to Mr. Reilly, appellant claims, Mr. Reilly would have told counsel appellant suffered from cognitive or mental deficits.

Appellant alleges similar defects in counsel's pre-trial consultation with another psychologist, Dr. Michael Schwabenbauer, and argues counsel was ineffective in failing to seek a referral from Dr. Schwabenbauer. He claims counsel, despite receiving unfavorable conclusions from Mr. Reilly and Dr. Schwabenbauer, should have continued to seek additional mental-health experts and obtained a neuropsychological examination of appellant.

Appellant alleges counsel unreasonably expected Mr. Reilly and Dr. Schwabenbauer to request additional information if they needed it to render their opinions; instead, counsel should have sought out and provided the experts additional information, including a 1980 diagnosis from a childhood psychologist that concluded appellant had minimal brain dysfunction and a low intelligence quotient (IQ). Appellant avers that — even though Mr. Reilly and Dr. Schwabenbauer both concluded he did not suffer from cognitive or mental impairments — counsel was unreasonable for not calling them as penalty-phase witnesses and further pursuing additional mitigating evidence of his mental health. He asserts counsel's basis for not providing extensive mitigating evidence of his cognitive and mental impairments, i.e., there was no legitimate mental-health issue, is improper because counsel was never in a position to reasonably determine whether a bona fide issue existed, as he failed to fully investigate and obtain critical mental-health records.

Appellant also argues counsel was ineffective for failing to present mitigating evidence of his good behavior in prison and the likelihood of positive prison conduct in the future. Although he admits counsel generally submitted to the jury that he adapted well in prison and cooperates with prison personnel, he claims counsel failed to present witnesses and other available evidence to support the notion he had behaved himself in prison and would exhibit the same behavior in the future.

The Commonwealth counters that counsel articulated a reasonable basis for his decisions, especially considering his limited financial resources and appellant's refusal to cooperate with counsel. Noting the PCRA court specifically found counsel credible, the Commonwealth argues counsel reasonably relied on Mr. Reilly's and Dr. Schwabenbauer's conclusions that appellant had no mental abnormalities and assumed those experts would have requested additional information if they needed it to render their opinions. Based on Mr. Reilly's and Dr. Schwabenbauer's determinations, the Commonwealth contends counsel was reasonable in electing not to call them as witnesses. Also, it offers additional reasons supporting counsel's decision not to present mental-health evidence: (1) appellant ran his own real-estate enterprise; (2) he functioned well in everyday life; (3) his mother testified his "flat affect" or indifferent demeanor was a family trait that pre-dated his 1991 accident; and (4) the crime of which he had just been convicted entailed extensive planning and premeditation.

At the PCRA hearings, trial counsel testified he explored presenting mental-health evidence at the penalty phase and consulted with two experts prior to trial, Dr. Schwabenbauer and Mr. Reilly. Trial counsel stated Dr. Schwabenbauer treated appellant after his 1991 vehicle accident, and he met with Dr. Schwabenbauer March 22, 2002, so that he could review appellant's records. N.T. PCRA Hearing, 10/22/10, at 108-10. According to counsel, Dr. Schwabenbauer told him: (1) appellant made a good

recovery from the accident, both physically and mentally; (2) there were no signs of lasting residual cognitive effects from the accident; (3) appellant showed no signs of losing control of his emotions; (4) the fact appellant did not lose consciousness during the accident suggested that serious brain injury was unlikely; (5) he did not think appellant's head injury was serious but instead would be considered a "mild range" injury; and (6) if appellant had any personality issue, it pre-dated the accident. Id., at 111-13, 160. Counsel testified Dr. Schwabenbauer never requested additional information before rendering his opinion or advised him to consult with a neuropsychologist or psychiatrist. Id., at 159, 161, 171. He had the impression Dr. Schwabenbauer was hesitant about being involved in a criminal case and was not interested in helping the defense develop the penalty phase. Id., at 113-14, 128. In April, 2002, counsel wrote a letter to Dr. Schwabenbauer requesting he test appellant for neurological defects, to which Dr. Schwabenbauer responded one month later, indicating he was unwilling to participate further and offering to refer counsel to other psychologists. See id., at 128-33. Dr. Schwabenbauer only mentioned a referral to qualified psychologists; he did not suggest a psychiatric assessment or refer counsel to a neuropsychologist. Id., at 131. Counsel declined Dr. Schwabenbauer's referral to other psychologists because he had already obtained Mr. Reilly. Id., at 132-33.

Regarding Mr. Reilly, counsel testified at the PCRA hearings that he spoke to him twice over the phone and requested he evaluate appellant's "flat affect," i.e., lack of emotion, and any other potential cognitive or mental defects. Id., at 39-41, 84-85. Counsel stated he chose Mr. Reilly because he was affordable, had a forensic background as a clinical psychologist, and was well respected in the professional community because he gives fair and honest assessments, regardless of whether the results are favorable to the party seeking the evaluation. Id., at 84-85, 148-49. Counsel

provided Mr. Reilly with all of appellant's medical records from 1991 to 2002, id., at 91, but did not give him appellant's prison,[20] grade school, or juvenile records, id., at 101, 117. Mr. Reilly informed counsel he would review appellant's records and test appellant's intelligence, verbal skills, knowledge, and mechanical reasoning. Id., at 87-88. According to counsel, Mr. Reilly wanted to first establish whether appellant had any cognitive defects before comparing his present condition with prior records to determine if his impairments deteriorated or ameliorated. Id., at 89, 162-63. Mr. Reilly also told counsel appellant's "frontal-lobe" brain injury from his 1991 accident would not cause brain damage, emotional defects, or cognitive impairments, as such deficiencies are caused by a deep intrusion, not frontal-lobe damage. Id., at 88-90, 165-66. Counsel informed Mr. Reilly about appellant's 1996 emergency-room visit and MRI records from that visit, which Mr. Reilly concluded was an incident too "isolated" to be indicative of mental impairments. Id., at 93-96. Mr. Reilly examined appellant three separate times in May, 2002. Id., at 43. He issued a report concluding appellant did not suffer from any mental abnormalities and had no cognitive or emotional problems. Id., at 56-57, 73-74, 79, 93-94, 97-98. Mr. Reilly never requested additional information from counsel before rendering his report. Id., at 164.

Counsel described the basis for his penalty-phase decisions at the PCRA hearings. He decided there was no genuine mental-health issue based on Dr. Schwabenbauer's and Mr. Reilly's conclusions and the fact that appellant successfully maintained a real-estate career. Id., at 52-54, 59-61, 172-74. He also explained the Commonwealth at trial set forth substantial evidence of appellant's controlling personality, deception, and planning, i.e., efforts requiring mental competence and

---

[20] Counsel also explained he did not wish to present expert testimony on appellant's positive prison behavior because it would invite the Commonwealth to implicate his future dangerousness. Id., at 102.

intelligence.  Id.  Counsel reasoned because appellant lacked any real mental-health component, presenting weak mental-health evidence would offend the jury and convey to it that the defense was appealing to its sympathy.  Id.  Counsel felt this approach would backfire and undermine his attempt to save appellant from the death penalty by convincing the jury it should make appellant serve a life sentence if it truly wanted to punish him.  Id.  He did not call Dr. Schwabenbauer as a witness because he was unwilling to help, id., at 114, 130-31, and he did not call Mr. Reilly because he would have testified in accordance with his report that appellant was normal, had average intelligence, and could function regularly at the time of the murder, id., at 168.  He also stated that presenting expert testimony of appellant's mental-health records would give rise to cross-examination or conflicting Commonwealth expert testimony demonstrating appellant made a good recovery from his 1991 injury and thus did not suffer cognitive deficiencies.  Id., at 171-72.

Dr. Schwabenbauer and Mr. Reilly both testified at the PCRA hearings.  Dr. Schwabenbauer agreed counsel consulted with him and requested he perform neuropsychological testing on appellant, but he claimed counsel never provided him with appellant's 1996 MRI records, which indicated appellant's brain damage.  N.T. PCRA Hearing, 6/1/11, at 43, 57-58.  Dr. Schwabenbauer also stated he told counsel appellant should be examined by a neuropsychologist.  Id., at 47.  Mr. Reilly testified counsel never provided him with appellant's 1996 MRI records, juvenile records, or the 1980 diagnosis from his childhood psychologist.  N.T. PCRA Hearing, 8/10/09, at 114-15. Mr. Reilly asserted, had counsel given him these records, he would have recommended appellant undergo neuropsychological testing.  Id., at 116-18.

The PCRA court held counsel had a reasonable basis for not presenting mental-health testimony at the penalty phase, especially when considering Dr.

Schwabenbauer's and Mr. Reilly's conclusions and the fact appellant did not cooperate with counsel regarding the penalty phase. PCRA Court Opinion, 3/27/12, at 46. The court explained appellant repeatedly advised counsel not to pursue penalty-phase evidence and refused to meet with a mental-health expert. It noted appellant instructed counsel on several occasions to focus on the guilt phase and refused to spend time and money purely on the penalty phase. Id., at 37. Specifically, the court highlighted a letter appellant wrote to counsel January 14, 2002, stating: (1) he would commit suicide if he lost the guilt phase; (2) he wanted counsel to focus only on the guilt phase; (3) he did not wish to defend or spend funds on the penalty phase; (4) the only defense he wanted to present at the penalty phase was a brief argument, and his parents could speak if they wished; (5) not to bother his acquaintances about the penalty phase; and (6) he was of sound mind and would not change his view on the penalty phase. See id., at 38 (quoting appellant's letter to counsel in full). Appellant expressed the same views on three separate occasions from February to March, 2002, refusing to meet with a "head doctor" unless it helped the guilt phase and reiterating he would not participate in the penalty phase. Id., at 39. Appellant never abandoned his position regarding the penalty phase; counsel convinced appellant to allow Mr. Reilly to test him only because he told him it would help in the guilt phase. See id., at 37-40; see also N.T. PCRA Hearing, 10/22/10, at 24, 122, 145, 157. After a meeting with Mr. Reilly, appellant wrote counsel and told him Mr. Reilly was not helpful or worthwhile. PCRA Court Opinion, 3/27/12, at 43-44.

The court also concluded appellant failed to establish prejudice. Id., at 51. It credited the Commonwealth's PCRA mental-health experts over appellant's, finding appellant's expert neuropsychologist's conclusions were "convincingly contradicted."

Id., at 48-50.[21]  The Commonwealth's PCRA experts evaluated appellant and concluded he was not suffering from a mental disorder at the time of the offense, he was able to understand the criminality of his conduct and could conform to the law, and his flat affect was not related to his 1991 injury but was a characteristic since childhood and stemmed from his narcissistic and antisocial traits.  See id., at 49-50.

"The inquiry of whether trial counsel failed to investigate and present mitigating evidence turns upon various factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the mitigation evidence that could have been presented."  Commonwealth v. Simpson, 66 A.3d 253, 277 (Pa. 2013) (citation omitted).  The reasonable basis prong of an ineffectiveness claim does "'not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis.'"  Chmiel, at 1127 (citation omitted).

First, we note the PCRA court found counsel's testimony credible over Dr. Schwabenbauer's and Mr. Reilly's, and such credibility findings, if supported by the record, are binding on this Court.  PCRA Court Opinion, 3/27/12, at 40-42; see also Dennis, at 305 (PCRA court's credibility findings, where supported by record, are binding on reviewing court).  Accordingly, we are bound by the supported determination that

---

[21] Appellant offered Dr. Jonathan Mack as his expert neuropsychologist.  Dr. Mack reviewed appellant's medical records and concluded appellant suffered from cognitive defects and brain damage as a result of the 1991 accident.  See id., at 48.  The court noted Dr. Mack relied on a juvenile record, which contained a 1980 diagnosis from a childhood psychologist that appellant had minimal brain dysfunction and a low IQ.  Id., at 48 n.27.  It found telling, and not helpful to appellant's case, the fact he saw the psychologist for setting fires and other behavioral problems.  Id.  The court explained, had appellant's PCRA expert testified at the penalty phase, that evidence would have been admissible and thus the jury would have learned that committing arson was nothing new to appellant.  Id.

appellant's counsel provided all medical records from 1991 to 2002, including the 1996 MRI records, to Dr. Schwabenbauer and Mr. Reilly. See N.T. PCRA Hearing, 10/22/10, at 91-100, 106, 170. Thus, appellant's argument that Dr. Schwabenbauer and Mr. Reilly would have concluded he suffered cognitive and mental impairments had they been given his 1996 MRI records lacks arguable merit.

We agree with the PCRA court that counsel was reasonable in conducting his investigation by relying upon the experts' determinations and putting forth a mitigation defense.[22] Counsel's investigation included compiling a social history from appellant and his family, interviewing potential lay witnesses, and reviewing medical, juvenile, prison, and employment records. As recognized by the PCRA court, counsel retained two mental-health experts to evaluate appellant's medical records — one of which examined appellant in person on three separate occasions.[23] We cautioned in Lesko, that in applying Strickland to mental-health mitigation cases, "courts must be careful not to conflate the roles and professional obligations of experts and lawyers." Lesko, at 382. Here, counsel consulted with those experts so that, as he hoped, he would be able to present evidence of mental impairment. Counsel met with Mr. Reilly because he would give him an accurate explanation as to whether appellant indeed suffered mental defects,

---

[22] Debatably, counsel had no duty to pursue mental-health experts because appellant repeatedly refused to see a "head doctor" or help him prepare for the penalty phase, and specifically instructed counsel not to present any mitigating evidence except for brief argument and his parents' testimony. See, e.g., Commonwealth v. Reid, 811 A.2d 530, 553 (Pa. 2002) (counsel has no duty to undertake reasonable investigation where defendant specifically advised him not to present evidence of mitigating circumstances (citations omitted)).

[23] Notably, counsel needed to convince appellant these mental-health experts would aid in the guilt phase to gain his approval in retaining them. Had counsel continued to search for a mental-health expert willing to testify appellant suffered from brain damage and cognitive impairments — as appellant now suggests he should have done — appellant likely would have forbidden counsel from offering this testimony, considering he maintained his intransigence regarding the penalty phase.

which would save counsel from expending his limited financial resources on fruitless mental-impairment claims. Counsel provided the experts with all of appellant's medical records, and they did not request additional information to render their opinions. The experts concluded appellant did not suffer mental or cognitive defects and his 1991 injury could not have been the cause of his flat affect or indifferent demeanor. Appellant's PCRA experts, who now dispute Dr. Schwabenbauer's and Mr. Reilly's conclusions, might call into question their professional opinions; however, "that is not the same thing as providing a basis to fault [] counsel's legal performance." Id. Thus, based on the experts' conclusions, it was reasonable for counsel to decide that presenting unsupported, weak mental-health evidence would be unsuccessful and could backfire and offend the jury by appearing to appeal to sympathy.

Alternatively, we see no error in the PCRA court's conclusion that appellant has not established prejudice. At sentencing, counsel presented testimony from five lay witnesses and submitted four mitigating circumstances to the jury: (1) a positive work history; (2) successful adaptation to prison and cooperation with prison personnel; (3) a history of showing compassion and mercy to others; and (4) a history of neurological impairment and brain damage — all evidence that would fall within 42 Pa.C.S. § 9711(e)(8), the catch-all mitigator.[24] Notably, although counsel did not present expert testimony, he still attempted to submit evidence to the jury of appellant's brain injury and cognitive impairments, i.e., his mother's testimony that he suffered a severe accident, which caused brain injury and long-term memory loss, impaired his cognitive abilities, changed his emotions, and flattened out his personality. PCRA Court Opinion, 3/27/12,

---

[24] As previously noted, counsel also submitted as a mitigating circumstance that appellant had no significant history of prior criminal convictions, id., § 9711(e)(1), which the jury was required to find because of a stipulation between appellant and the Commonwealth.

at 85-87, 89. The jury found only appellant's positive work history as a mitigating circumstance under the catch-all mitigator.

To establish prejudice, appellant must prove:

"[T]here is a reasonable probability that, absent counsel's failure to present the mitigation evidence he currently proffers, [appellant] would have been able to prove at least one [more] mitigating circumstance by a preponderance of the evidence and that at least one jury member would have concluded that the mitigating circumstance(s) outweighed the aggravating circumstance(s)."

Philistin, at 28 (quoting Lesko, at 383). A majority of this Court in Commonwealth v. Tharp, 101 A.3d 736 (Pa. 2014), reasoned that the weighing of mitigating circumstances is qualitative, not quantitative, and thus a finding by the jury of the catch-all mitigator does not per se preclude this Court from deeming counsel ineffective because the jury may have given that factor more weight had counsel proffered additional mitigation evidence. See id., at 775-77 (Castille, J., concurring); id., at 777 (Saylor, J., concurring); id., at 778 (Eakin, J., concurring); see also Commonwealth v. Rivera, 108 A.3d 779, 807 n.18 (Pa. 2014) (noting majority of this Court determined weighing of mitigating circumstances is qualitative, not quantitative).

Yet, not only does appellant fail to acknowledge the jury found the catch-all mitigating circumstance, he also does not argue the evidence counsel failed to present would have caused at least one juror to add more weight to the catch-all mitigator. He only asserts a proper mental-health investigation "would have directly supported the neurological impairment and brain damage mitigating factor … which w[as] submitted to the jury under [] § 9711(e)(8), but not found[.] Such expert testimony also could have supplied the basis for submitting additional mitigating circumstances to the jury[.]" Appellant's Brief, at 65. Specifically as to prejudice, appellant merely claims that, based on the testimony offered by his PCRA experts, "confidence in the outcome of the penalty

phase is undermined." Id., at 69. We note the PCRA court did not find appellant's PCRA experts credible, and such credibility findings, which are supported by the record, are binding on this Court. See PCRA Court Opinion, 3/27/12, at 47-51. Accordingly, appellant has failed to demonstrate the requisite prejudice for relief on his mental-health mitigating evidence claim.

We also agree with the PCRA court's conclusion that appellant failed to establish counsel was ineffective for failing to offer mitigating testimony supporting appellant's good prison behavior. At the penalty phase, counsel submitted to the jury a prison-adjustment summary, which evinced appellant's good prison behavior, and asked the jury to find appellant's successful adaptation to prison as a mitigating circumstance under the catch-all mitigator. Counsel did not present testimony on this point because the court ruled if he made future dangerousness an issue, or argued that "life means life" or that appellant would not be paroled, it would instruct the jury on the concepts of pardons and executive clemency. See N.T. Trial, 10/8/02, at 106-10; N.T. PCRA Hearing, 10/22/10, at 102-03; PCRA Court Opinion, 3/27/12, at 44, 89.

Appellant asserts only that counsel was ineffective in failing to present testimony of his good prison behavior. He fails to allege how such testimony would not merely be cumulative of the admitted prison-adjustment summary — evidence that established his good prison behavior. He also does not argue counsel lacked a reasonable basis for not presenting testimony or making future dangerousness an issue. And he does not explain how he was prejudiced by counsel's alleged ineffectiveness, but merely contends counsel's ineffectiveness in presenting testimony of good prison behavior, coupled with his deficiencies in investigating mental health, undermined confidence in the penalty phase's outcome. See Appellant's Brief, at 69. Accordingly, we conclude appellant has failed to demonstrate he is entitled to relief.

**Issue XII:   The Trial Court's Alleged Errors in Penalty-Phase Instructions**

Appellant asserts the trial court's penalty-phase instructions were erroneous and violated the Eighth and Fourteenth Amendments of the United States Constitution. Particularly, appellant claims the court (1) erred in giving a "more terrible less terrible" instruction because it narrowed the jury's consideration of mitigating circumstances, and (2) improperly limited mitigating evidence by stating, if counsel argued appellant posed no risk of future danger to others, it would instruct the jury on the commutation process in Pennsylvania.

The Commonwealth counters that appellant's claims are waived and alleges he "attempts to superficially couch this claim as one of ineffective assistance," which fails because he makes no effort to develop the claim.  Commonwealth's Brief, at 55. Addressing the merits, it asserts the court acted within its discretion, and did not limit mitigating evidence but instead accurately stated the law when instructing the jury on the commutation process.

As the PCRA court correctly concluded, appellant's contentions are waived for failure to raise them at trial or on direct appeal.  See 42 Pa.C.S. § 9544(b).  To the extent appellant attempts to make cursory allegations of ineffectiveness, we conclude they are waived for failure to develop any argument.  Walter, at 566 (holding claims waived for failure to develop them).

**Issue XIII:   The "Grave-Risk" Aggravator was Unconstitutionally Vague and Counsel Failed to Object**

Appellant claims Pennsylvania's "grave-risk-of-death" aggravating circumstance, 42 Pa.C.S. § 9711(d)(7),[25] is unconstitutionally vague and susceptibly overbroad.  He

---

[25] "In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense."  Id.

asserts because the Commonwealth identified Ms. Riddle, firefighters, police, and neighbors as the potential "another person" under subsection (d)(7), and the jury did not identify which individual constituted that person, the aggravating factor was not found beyond a reasonable doubt. Further, based on that analysis, appellant contends the court should have provided a limiting instruction to the jury requiring it to identify the person it found to have been endangered.

In response, the Commonwealth notes this Court has previously addressed and rejected vagueness challenges to the "grave-risk" aggravator, the applicable definition of the aggravator is easily understood by juries, and ample evidence supported the jury's finding of the § 9711(d)(7) aggravator.

Because counsel did not object at the penalty phase, appellant's allegation of trial court error is waived for failure to raise it below. Id., § 9544(b); see also Commonwealth v. Diggs, 949 A.2d 873, 881 (Pa. 2008) (appellant waived claim of trial court error regarding jury charge because counsel did not raise any contemporaneous objection). Insofar as appellant asserts counsel was ineffective for failing to object, we conclude his cursory claim is waived for failure to develop the issue. See Walter, at 566 (holding claims waived for failure to develop them). Despite waiver, the PCRA court correctly held appellant's allegation of trial court error is meritless, as "this Court has already held the 'grave risk of death' aggravator in § 9711(d)(7) is not unconstitutionally vague on its face." Commonwealth v. Wright, 961 A.2d 119, 157 (Pa. 2008) (citation omitted); see also Commonwealth v. Stevens, 739 A.2d 507, 524-25 (Pa. 1999). Thus, even if appellant properly developed his ineffectiveness claim, we would find counsel was not ineffective. See Commonwealth v. Washington, 927 A.2d 586, 603 (Pa. 2007) ("Counsel will not be deemed ineffective for failing to raise a meritless claim.").

**Issue XIV:   Denial of Full and Fair Review**

Appellant argues he was denied a full, fair, and meaningful review because of numerous procedural errors by the PCRA court.   Therefore, he requests a remand to correct the deficiencies.   Such relief is not warranted.

**A.   The PCRA Court's Denial of Discovery**

Appellant's first complaint concerning the PCRA proceedings is the denial of discovery pertaining to the Commonwealth's canine DNA evidence, particularly denying discovery of Dr. Halverson's database used in appellant's case and a request for on-sight inspection of Dr. Halverson's lab.   The Commonwealth contends appellant was permitted sufficient latitude in cross-examining Dr. Halverson and that inspecting her lab ten years after trial would have no probative value.

"On the first counseled petition in a death penalty case, no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause."   Pa.R.Crim.P. 902(E)(2).   This Court reviews the denial of a post-conviction discovery request for an abuse of discretion.   Commonwealth v. Edmiston, 65 A.3d 339, 353 (Pa. 2013).   "'A showing of good cause requires more than just a generic demand for potentially exculpatory evidence.'"   Commonwealth v. Collins, 957 A.2d 237, 272 (Pa. 2008) (quoting Commonwealth v. Bryant, 855 A.2d, 726, 750 (Pa. 2004)).

These issues are waived because appellant did not state them with sufficient specificity in his Concise Statement of Matters Complained of on Appeal.   See Pa.R.A.P. 1925(b)(4)(vii).   In his concise statement, appellant raised the issue: "Whether the PCRA [c]ourt erred in denying Petitioner/Appellant's motions for discovery filed May 2, 2008, June 18, 2009, September 18, 2009 and November 23, 2009[.]"   Appellant's Rule 1925(b) Statement, 5/14/12, at 5.   These motions requested discovery of virtually all

evidence related to appellant's case, including wholesale discovery of all evidence pertaining to Dr. Halverson's canine DNA evidence. Appellant's brief also fails to address the particular motions and evidence of which the court improperly denied him discovery. Regardless, our review of the record leads us to conclude the PCRA court did not abuse its discretion by denying discovery regarding Dr. Halverson's database and on-sight inspection of her lab, as those requests amounted to nothing more than a fishing expedition. See PCRA Court Opinion and Order, 9/16/08, at 1-4, 11; 7/10/09, at 1-2; 9/21/09, at 1; 2/17/10, at 1-2; see also Collins, at 272 (discovery request based on mere speculation of potential exculpatory evidence fails to establish good cause discovery requirement).

## B. Rulings at the PCRA Court Evidentiary Hearing

Appellant asserts the PCRA court interfered with his right to adequately examine witnesses and present relevant testimony on several issues during the PCRA hearings, which collectively prevented fact development in support of his claims. Initially, we note appellant, in his concise statement, raised the issue:

> Whether the PCRA [c]ourt erred in denying Petitioner/Appellant's other motions, including but not limited to a motion to present a witness in rebuttal to Commonwealth witness Joy Halverson[,] a motion to recall [] Timothy George[,] [sic] and a motion to strike a statement contained in Commonwealth's Exhibit 20, slide 9[.]

Appellant's Rule 1925(b) Statement, 5/14/12, at 5. The PCRA court found appellant's use of the phrase "including but not limited to" did not preserve issues not specifically raised; thus, appellant waived all issues except for the ones set forth in his issue. PCRA Court Opinion, 5/22/12, at 2 n.1 (citation omitted).[26] We agree and therefore address

---

[26] We observe that the court found appellant erroneously referred to Attorney Timothy Lucas as Timothy George. Id.

only the three claims raised above, as the remaining contentions included in appellant's brief are waived.

Appellant contends the PCRA court erred in preventing him from presenting rebuttal testimony from DNA expert Dr. Antoinette Marsh. The Commonwealth asserts the court permitted appellant sufficient latitude in cross-examining Dr. Halverson and it soundly exercised its discretion in finding additional rebuttal evidence unnecessary.

"It is well settled that the admission or rejection of rebuttal evidence is within the sound discretion of the trial court." Commonwealth v. Bond, 985 A.2d 810, 829 (Pa. 2009). Here, the PCRA court precluded the proposed expert rebuttal testimony because it would have been merely cumulative and exceeded the parameters of rebuttal evidence. PCRA Court Opinion, 12/20/10, at 2. The court determined Dr. Marsh's proffered opinion was premised on various speculative assumptions, which undermined appellant's request. Id. Further, the court reasoned, appellant had ample opportunity to present evidence on the relevant Frye issues and indeed had done so, as he presented "virtually every aspect of animal DNA testing and [Dr.] Halverson's methodology." Id. Accordingly, the court did not abuse its discretion in denying the presentation of rebuttal testimony from Dr. Marsh. Moreover, appellant fails to assert the court abused its discretion; he only argues the court's ruling was error. See Commonwealth v. Bryant, 67 A.3d 716, 726 (Pa. 2013) (abuse of discretion not found based on mere error of judgment, but rather where ruling is manifestly unreasonable or result of partiality, prejudice, bias, or ill-will).

Appellant next argues the PCRA court erred in preventing him from recalling trial counsel Timothy Lucas at the PCRA hearings to impeach his credibility. Noting there was no evidence of bias from Lucas as a result of his federal-tax-evasion charges and his

guilty plea had no connection to appellant's PCRA proceedings, the Commonwealth contends the PCRA court properly denied appellant's motion to recall Lucas.

Lucas was charged June 18, 2010, and pled guilty to federal income tax evasion August 4, 2010. Yet, he testified at the PCRA hearings in August, 2009.[27] The PCRA court denied appellant's motion to recall Lucas, concluding his offense did not constitute crimen falsi because he still had not been sentenced as of the date of appellant's motion and the court's ruling. PCRA Court Opinion and Order, 12/30/10, at 1-2. The court determined that allowing appellant to recall Lucas would "condone a fishing expedition[,]" as it was unreasonable to conclude he would attempt to distort his PCRA testimony to curry favor with the Commonwealth, which is not involved in federal tax investigation. Id., at 2. Further, the court reasoned, appellant submitted Lucas' plea agreement, which was devoid of evidence he would receive a lesser sentence for cooperation with law enforcement. Id. We conclude the PCRA court did not abuse its discretion in preventing appellant from recalling Lucas.

Appellant alleges the PCRA court erred in failing to strike a "PowerPoint presentation" slide in a Commonwealth exhibit, which referenced a statement made by Ms. Treiber, Jessica's mother, that she planned to seek child support from appellant. The Commonwealth submits the admission of evidence in PCRA proceedings lies within the sole discretion of the PCRA court, and it acted within that discretion in denying the motion.

The court concluded it was not necessary to strike the statement because Ms. Treiber testified at trial that she told appellant she planned to seek child-support payments and it would determine what weight, if any, to give to the information. PCRA

---

[27] As previously noted, the court held ten evidentiary hearings from July 7, 2009, to August 4, 2011.

Court Order, 12/13/10, at 1.   Although appellant included this allegation of error in his Rule 1925(b) statement, he offers no argument as to that issue.   Accordingly, his claim is waived for failure to develop it in any meaningful fashion.   See Walter, at 566 (holding claims waived for failure to develop them).

The order of the PCRA court is hereby affirmed.   Jurisdiction relinquished.

Mr. Justice Baer, Madame Justice Todd and Mr. Justice Stevens join the opinion.

Mr. Chief Justice Saylor files a dissenting opinion.