J-S09045-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SCOTT HARMON | : | |
| | : | |
| Appellant | : | No. 1132 EDA 2020 |

Appeal from the PCRA Order Entered February 27, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0013137-2009

BEFORE: OLSON, J., McCAFFERY, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: **FILED: APRIL 23, 2021**

Scott Harmon ("Harmon") appeals from the Order denying his first Petition for relief filed pursuant to the Post Conviction Relief Act ("PCRA"). **See** 42 Pa.C.S.A. §§ 9541-9546. We affirm.

This Court previously described the factual background underlying Harmon's convictions, which we adopt herein. **See Commonwealth v. Harmon**, 83 A.3d 1074 (Pa. Super. 2013) (unpublished memorandum at 1-3). Relevant to the instant appeal, in the early morning hours of April 19, 2008, Timothy Haines ("Haines") was driving in his gold Chevrolet Monte Carlo in the vicinity of Marvine and Tioga Streets in Philadelphia, Pennsylvania. Haines circled the block two or three times, until Harmon approached the vehicle. Harmon then fired several shots into the vehicle with an automatic weapon, killing Haines. Harmon was arrested several months later, and charged with first-degree murder, carrying a firearm without a license,

carrying a firearm on the public streets of Philadelphia, and possession of an instrument of crime.[1]

Harmon proceeded to a bench trial on July 21, 2011.[2] At trial, eyewitness Michael Johnson ("Johnson") testified that he was near the corner of Marvine and Tioga Streets on the night of the shooting. Johnson observed Haines's car circling the block several times, and witnessed Harmon approach Haines's vehicle and begin shooting into it before fleeing the scene. Oliver Travers ("Travers") provided a police statement shortly after the shooting that identified Harmon as the shooter. At trial, however, Travers testified that he did not witness the shooting and did not remember providing his statement to police.

Regina Pepples ("Pepples") testified that at the time of the shooting, she had known Harmon, whom she knew as "Troy," for two weeks. Pepples testified that she had been driving around with Harmon in his Cadillac, and observed him place an automatic handgun under the seat of the Cadillac. She testified that two hours before the shooting, Harmon parked the Cadillac and removed the gun. Pepples and Harmon then drove away in another vehicle, a Chevrolet Lumina. Pepples testified that they parked the Lumina on Marvine

_____

[1] 18 Pa.C.S.A. §§ 2502(a), 6106, 6108, 907.

[2] Harmon was initially represented by the Defender Association of Philadelphia. After Harmon's preliminary hearing, but prior to trial, Harmon retained Allan Sagot, Esquire ("trial counsel"), who represented Harmon at trial.

Street, where Pepples first saw Haines's Monte Carlo. Pepples recognized Haines, as she had seen Haines talking to Harmon about money that was owed to Haines by Joseph Farris ("Farris"). Pepples stayed in the Lumina, and observed Harmon, Farris, Travers, and Johnson talking to each other at the corner of Marvine and Tioga Streets. Pepples observed Haines approach in the Monte Carlo. Pepples saw Haines pull his car over and talk to Harmon, and then she saw Harmon pull out a gun and start shooting at the Monte Carlo.

Harmon testified in his defense that Johnson had actually been the person who shot Haines. Harmon testified that on the night of the shooting, he parked his car near the corner of Marvine and Tioga Streets, and went to his grandmother's house for transmission fluid. As he was standing on the porch of his grandmother's house, Harmon saw Haines drive around the block two times. Harmon testified that he heard gunshots, and observed Travers and Johnson firing at Haines's vehicle. Harmon testified that he was not shooting or in possession of a gun; he did not know Pepples; he has never used the name "Troy;" and he never drove a Chevrolet Lumina, only a silver Cadillac.

Farris testified that he was with Harmon at a bar on the night of the shooting. Farris testified that he drove with Harmon, in separate vehicles, back to the vicinity of Marvine and Tioga Streets, where he parked while Harmon went to his grandmother's house to retrieve some mail. At that point,

Farris saw Haines's car approach the corner, and Farris heard several gunshots, but did not see the shooter.

At the conclusion of trial, the trial court found Harmon guilty of the above-referenced offenses. At the start of Harmon's sentencing hearing on December 20, 2011, Harmon made an oral Motion for extraordinary relief, requesting a new trial based upon after-discovered evidence. The trial court denied Harmon's Motion, and sentenced Harmon to serve an aggregate sentence of life in prison without the possibility of parole. Harmon filed post-sentence Motions and a Motion to reconsider the denial of his Motion for extraordinary relief, which the trial court denied. This Court affirmed Harmon's judgment of sentence, and the Pennsylvania Supreme Court denied allowance of appeal. *See Harmon*, 83 A.3d 1074 (Pa. Super. 2013) (unpublished memorandum), *appeal denied*, 89 A.3d 660 (Pa. 2014).

On September 15, 2014, Harmon filed the instant, timely PCRA Petition. On March 5, 2018, following several changes in PCRA counsel, Harmon's instant counsel entered her appearance and filed an Amended PCRA Petition. On February 5, 2019, Harmon filed a counseled Supplemental Amended PCRA Petition. The Commonwealth filed a Motion to dismiss Harmon's PCRA Petition, after which Harmon filed another counseled Supplemental Amended PCRA Petition. The Commonwealth filed another Motion to dismiss the Petition, to which Harmon filed a Response. The Commonwealth thereafter filed a Letter in Brief.

- 4 -

The PCRA court held an evidentiary hearing on February 25 and 26, 2020. At the hearing, Pepples recanted her trial testimony, claiming that she had only implicated Harmon to police after she felt pressured to do so in her interview. Additionally, the PCRA court heard testimony from Farris, a friend of Pepples, and multiple police officers and detectives who had investigated the shooting.[3] At the conclusion of the hearing, the PCRA court denied Harmon's Petition. Harmon filed a timely Notice of Appeal, and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

Harmon raises the following issues for our review:

Is [Harmon] entitled to a new trial due to (1) trial counsel's ineffectiveness in failing to secure and use impeachment evidence on the main prosecution witness; failing to correct the court's misstatement at trial as to how long after the shooting the main inculpatory witness accused [] Harmon; and failing to secure a critical defense witness's pre-trial interview and prepare the witness to explain the same; and/or (2) due to the recantation by the main prosecution witness?

Brief for Appellant at 4.

We review an order [denying] a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. This Court may affirm a PCRA court's decision on any grounds if the record supports it. We grant great deference to the factual findings of the PCRA court and will not disturb those findings

_____

[3] Additionally, we note that trial counsel was purportedly contacted in anticipation for the PCRA hearing, but did not testify, as he indicated that he had no recollection of the 2011 trial.

unless they have no support in the record. However, we afford no such deference to its legal conclusions. Further, where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review is plenary.

***Commonwealth v. Ford***, 44 A.3d 1190, 1194 (Pa. Super. 2012) (citations omitted).

In his first issue, Harmon makes several distinct claims relating to the ineffective assistance of his trial counsel, which we will address separately. To prevail on a claim of ineffective assistance of counsel under the PCRA, a petitioner must plead and prove, by a preponderance of the evidence, that counsel's ineffectiveness "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii). Specifically,

> [t]o be entitled to relief on an ineffectiveness claim, a PCRA petitioner must establish: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) he suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability the result of the proceeding would have been different. ***Commonwealth v. Chmiel***, ... 30 A.3d 1111, 1127 (Pa. 2011) (employing ineffective assistance of counsel test from ***Commonwealth v. Pierce***, ... 527 A.2d 973, 975-76 (Pa. 1987)). Counsel is presumed to have rendered effective assistance. Additionally, counsel cannot be deemed ineffective for failing to raise a meritless claim. Finally, because a PCRA petitioner must establish all the ***Pierce*** prongs to be entitled to relief, we are not required to analyze the elements of an ineffectiveness claim in any specific order; thus, if a claim fails under any required element, we may dismiss the claim on that basis.

***Commonwealth v. Treiber***, 121 A.3d 435, 445 (Pa. 2015) (footnote and some citations omitted).

In his first ineffectiveness claim, Harmon argues that his trial counsel was ineffective in failing to properly investigate Pepples and impeach her testimony at trial. Brief for Appellant at 25-32. Harmon points to several ways in which trial counsel should have impeached Pepples, including David Farris's work records, which he asserts would have impeached Pepples's testimony regarding the Chevrolet Lumina; Pepples's identification of Joseph Farris as "Joseph Cook;" and Pepples's testimony that she knew Harmon as "Troy." *Id.* at 28-31. Harmon additionally asserts that the PCRA court misstated several facts regarding Pepples's testimony in its Opinion, and as a result, the PCRA court's credibility findings should be entitled to no deference. *Id.* at 31-32.

In its Opinion, the PCRA court addressed Harmon's argument as follows:

> [Harmon]'s claim is based on a misinterpretation of the testimony. Pepples testified only that she was inside of a Chevy Lumina that [Harmon] was driving at the time of the shooting. She stated that she and [Harmon] were originally in a Cadillac and then switched to a Chevy Lumina. Pepples did not testify that the Chevy Lumina belonged to David Farris. It was the [d]efense witness, [] Farris, who testified that his brother David drove a Chevy Lumina. N.T., 7/19/[]11[,] at 54. Therefore, trial counsel had no reason to impeach Pepples with David Farris's work records because Pepples never claimed to be in David Farris's Chevy Lumina.

> * * *

> Although Travers and Pepples identified a photograph of Joseph Cook in their police statements, the evidence presented at trial made clear that the identification was an error and that only one "Joe" was present on the night of the shooting: [] Farris. Defense witness, [] Farris himself testified that he was the "Joey" that [] Johnson had referred to in his testimony. …

[Harmon] himself testified that [] Pepples misidentified [] Farris as Joseph Cook in the photo and that [] Farris was the "Joe" on the scene. [N.T., 7/20/11,] at 125, 144. Moreover, Travers identified David Farris as "Joe's" younger brother in his statement to police. This was not a case of mistaken identity; all of the witnesses knew each other. It was clear to the court during the trial that the misidentification was an error which was inconsequential. Therefore, this issue has no merit.

PCRA Court Opinion, 8/11/20, at 21, 23. We agree with the sound analysis of the PCRA court, and affirm on this basis, with the following addendum.

Regarding the Chevrolet Lumina, Pepples confirmed at Harmon's PCRA hearing that her statement to police reflected that the Chevy Lumina was champagne in color, and not the green Chevy Lumina which purportedly belonged to David Farris. N.T., 2/25/20, at 141. Our review also discloses that, although Pepples testified that she knew Harmon as "Troy," Pepples nevertheless testified that she knew that Harmon's real name was "Scott." N.T., 7/19/11, at 36. Pepples also identified Harmon at trial. *See id.* at 37-38. Additionally, Harmon testified that he never went by the name "Troy;" Johnson testified that he only knew Harmon as "Scott;" and Travers testified that Harmon did not go by any other name. *See* N.T., 7/18/11, at 78, 103-04; N.T., 7/20/11, at 188-89. As a result, Pepples's consistent identification of Harmon, by whatever name, in addition to testimony which clearly called into question whether Harmon went by the name "Troy," indicates that Harmon did not suffer prejudice by trial counsel's failure to impeach Pepples in this regard. *See Commonwealth v. Lesko*, 15 A.3d 345, 394 (Pa. 2011) (concluding that counsel was not ineffective when "[a]dditional cross-

examination by counsel would have accomplished little"). Accordingly, trial counsel had no arguable basis to impeach Pepples's testimony; Harmon has not demonstrated that he suffered prejudice; and we can grant Harmon no relief on this claim. *See Treiber*, *supra*.

In his second ineffectiveness claim, Harmon argues that trial counsel was ineffective for failing to object to, or correct, the statements made by the prosecution and the trial court regarding the timing of Pepples's police statement after the shooting. Brief for Appellant at 32-33. Harmon asserts that the trial court and the prosecution repeatedly referred to Pepples as having given her statement to police on the night of the shooting, April 19, 2008, when, in reality, Pepples provided her statement the next day, on April 20, 2008. *Id.* According to Harmon, the trial court rejected Harmon's theory that Pepples and Johnson coordinated their statements to police on the grounds that Pepples provided her statement on the night of the shooting, rather than the day after. *Id.* at 33. Accordingly, Harmon asserts that trial counsel was ineffective in failing to correct, or object to, the trial court's statement in rendering its guilty verdict. *Id.*

In its Opinion, the PCRA court addressed Harmon's argument as follows:

> By way of background, when pronouncing the verdict, the trial court mentioned that Pepples['s] statement was given at 5:55 a.m., less than three hours after the murder, when it was addressing the defense argument that Pepples was not at the scene and was recruited to give a statement and told what to say. The court noted the absurdity of the argument and gave as one example the closeness in time of Pepples'[s] statement to the murder. While it is true that the statement was actually given

- 9 -

fifteen hours[4] after the murder and that counsel did not correct the time, the timing of the statement was merely stated as one example of the absurdity of the argument and not dispositive. The most incredulous part of the argument was that [] Pepples was not there, did not know [Harmon], and was pulled from out of nowhere and either recruited or coerced into making a statement by other witnesses or [Haines]'s family. Specifically, [Harmon] argues the failure to object to the time of the statement constituted ineffectiveness because the correct time supported the contention that [] Johnson (who gave a statement to police the day prior) had time after he left the homicide unit to coach Pepples on what to say to detectives in her statement. This is merely a bald assertion and fails for several reasons.

First, Johnson testified that he did not see Pepples at the crime scene. Secondly, there were additional details in Pepples'[s] statement and testimony from that of Johnson. For example, Pepples identified a photograph of [Harmon] (and [Harmon] himself at trial) as "Troy." Pepples is the only witness who refers to [Harmon] as "Troy." Additionally, Pepples testified that [Harmon] followed [Haines]'s car and continued to shoot into the vehicle as the car rolled. Johnson did not testify that [Harmon] moved with [Haines]'s car. Pepples['s] statement about [Harmon] following [Haines]'s car as he shot was later corroborated by the pattern of [fired cartridge casings] in the crime scene photos.

Therefore, the timing of Pepples['s] statement was not a material fact which influenced the verdict. Consequently, [Harmon] was not prejudiced by counsel's failure to object.

PCRA Court Opinion, 8/11/20, at 21-22 (footnote added).

The record supports the sound conclusion of the PCRA court, and we affirm on the basis of its Opinion, regarding Harmon's second claim. Additionally, our review discloses that trial counsel extensively cross-

---

[4] We note that Pepples's statement to police was approximately twenty-seven hours after the shooting, not fifteen, as stated by the PCRA court. However, such a discrepancy in the timing does not impact the PCRA court's sound analysis of the underlying issue presented by Harmon in his Petition.

examined Pepples, which revealed that Pepples provided her statement to police on the afternoon following the shooting. *See* N.T., 7/19/11, at 50-51. Because Harmon has not demonstrated that he was prejudiced by counsel's failure to object to the prosecution's and trial court's misstatement of the timing that Pepples provided her statement to police, we cannot grant him relief on this claim. *See Treiber*, *supra*.

In his third ineffectiveness claim, Harmon argues that trial counsel was ineffective in failing to secure a prior statement made by Farris, a defense witness. Brief for Appellant at 33-41. Harmon asserts that had trial counsel secured Farris's prior statement, he would have been able to adequately prepare Farris for trial, or counsel could have asked Farris anticipatory questions in his direct examination, to blunt the Commonwealth's cross-examination. *Id.* at 33-36. Harmon asserts that the PCRA court incorrectly relied on defense counsel's choice to call Farris as an indication that defense counsel knew the facts to which Farris would testify, when in fact, defense counsel had lacked the proper materials to make that determination. *Id.* at 36-41. Ultimately, Harmon claims that the Commonwealth's cross-examination damaged Farris's credibility, and that Harmon suffered prejudice as a result. *Id.* at 35-36.

At trial, Farris testified that he did not personally observe the shooting, as he had ducked down in his car when he heard gunshots. N.T., 7/20/11, at 18-20. On cross-examination, the Commonwealth attempted to impeach

Farris's testimony with a statement that he had provided to the Defender Association of Philadelphia, wherein he identified Johnson and Travers as the shooters. *Id.* at 27-29. Harmon's trial counsel responded that he did not have a copy of the statement, as it had not been provided to him in the file from the Defender Association. *Id.* at 28-29. After being presented with the statement, Farris testified that he did not intend for his statement to reflect what he actually saw; rather, he intended to convey what he was hearing from people in the neighborhood about who had committed the shooting. *Id.* at 37, 45. At several points during cross-examination, Farris reaffirmed that he did not witness the shooting; he did not know who had committed the shooting; and his statement to the investigator was not true to the extent that it indicated that he personally had witnessed the shooting. *Id.* at 37, 38-39, 44-45, 47-48, 49-50, 51-53. On redirect, trial counsel asked Farris the following:

Q. Did the investigator ask you if what you knew about the case or what you saw about the case?

A. He asked me what did I hear, what did I know.

Q. That is what you answered in the statement that the District Attorney presented to you?

A. Yeah, that's all.

*Id.* at 66-67.

At the PCRA hearing, Farris testified as follows:

Q. So, if [Harmon's] attorney had talked to you before you testified, would you have said anything different than what you said when you testified?

- 12 -

A. I mean I probably would have been more stern with my answers instead of saying, like all the I guesses. I probably could have clarified it as far as what the written statement, how you said there was inconsistencies, maybe if he would have went over them, I'm not sure.

Q. But the inconsistencies are the inconsistencies, right? What would have changed?

A. I would have told him a lot of the stuff in there wasn't like – when I took the stand, I didn't learn until I was on the stand the Judge was like I can't say what I actually didn't see. I didn't know anything about that or anything like that. I guess as far as handling myself on the stand and clarifying things, I don't know. I probably would have been better suited to answer them, I guess.

N.T., 2/25/20, at 33-34.

In light of the foregoing, we conclude that Harmon was not prejudiced by trial counsel not having Farris's prior statement before trial. Despite the prosecution impeaching Farris's trial testimony with the prior statement, Farris's own testimony at the PCRA hearing confirms that he would have merely been "more stern" with his answers; he would have been less equivocal; and he felt he would have been "better suited to answer" for the inconsistencies. *Id.* Notably, Farris does not implicate Harmon as the shooter in either Farris's trial testimony or in his prior statement; rather, he testified at trial that he did not see the shooter, and in his prior statement he implicated Johnson and Travers. Moreover, trial counsel attempted to rehabilitate Farris's testimony in his redirect examination, by reiterating that Farris's statement to investigators was intended to relay what Farris was hearing about the shooting, even if it was recorded as Farris's personal observations.

*See* N.T., 7/20/11, at 66-67. Accordingly, because Harmon has not established that trial counsel's acquisition and review of Farris's prior statement would have impacted the trial court's verdict, we can grant Harmon no relief on this claim. *See Treiber*, *supra*.

In his final issue, Harmon argues that the PCRA court erred by failing to credit Pepples's recantation testimony during the PCRA hearing. Brief for Appellant at 41-44. Harmon points to two separate instances in which he asserts that the PCRA court erred: (1) the PCRA court's statement that Pepples's recantation was not credible because she recanted suddenly, in the middle of her testimony at the PCRA hearing, when Pepples had only confirmed that the transcript of her prior testimony was accurate; and (2) the PCRA court's statement that Pepples provided her statement to police fifteen hours after the shooting, when it actually took place twenty-seven hours after the shooting. *Id.* at 41-42. Further, Harmon asserts that Pepples's trial testimony was directly contradicted by physical evidence, which bolsters the credibility of her recantation. *Id.* at 43-45.

The factual findings of a post-conviction court, which hears evidence and passes on the credibility of witnesses, should be given deference. *See Commonwealth v. Spotz*, 84 A.3d 294, 312, 319 (Pa. 2014). Our Supreme Court has acknowledged that

> [r]ecantation testimony is extremely unreliable. When the recantation involves an admission of perjury, it is the least reliable form of proof. The [PCRA] court has the responsibility of judging the credibility of the recantation. Unless the [PCRA] court is

satisfied that the recantation is true, it should deny a new trial. An appellate court may not disturb the [PCRA] court's determination absent a clear abuse of discretion.

***Commonwealth v. Henry***, 706 A.2d 313, 321 (Pa. 1997) (internal citations omitted).

In its Opinion, the PCRA court addressed this issue as follows:

The [PCRA c]ourt found Pepples['s] recantation at the PCRA hearing to be incredible. Pepples testified that she did not want to testify against [Harmon] at the original trial nor at the PCRA hearing. After initially confirming her original statement to police and trial testimony, Pepples suddenly decided to recant midway through her testimony and state that she wasn't present for the murder and that the detectives fed her all of the information contained in her statement. N.T., 2/25/[]20[,] at 144-54.

Not only was the timing and manner of Pepples['s] recantation incredible, but her testimony, that she went along with whatever the detectives told her to say, was belied by her trial testimony. While testifying at trial, Pepples corrected details in her police statement which she believed to be incorrect. While being read her statement to detectives the following exchanges occurred:

BY A[ssistant] D[istrict] A[ttorney ("ADA")] SAX:

Q. The question, do you know what money they were talking about, A, answer, Troy owed Tim money.

A. No, I didn't tell the detective that. I told him that Joe owed Tim money. I never said Troy owed him money.

N.T., 7/19/[]11[,] at 46.

BY ADA SAX:

Q. Troy stopped and was talking to Tim and Troy said come down the street to pick up his money.

A. I never said he was talking to Troy. I never said that.

Q. So if it says here –

A. When I read it, I asked the man to change it. He told me to initial it.

Q. But there are no changes or initials on here.

A. That is what I was getting ready to tell you but you came inside the courtroom.

Q. So everything else is correct?

A. Yes, everything else is correct but that.

Q. So Troy said come down the street to pick up his money, that didn't happen?

A. No.

*Id.* at 47.

These actions by Pepples at trial directly contradict her later statement that she went along with whatever the police told her to say and that she was not present at the scene. The [PCRA] court did not err in denying relief based on the recantation evidence[,] as it was incredible.

PCRA Court Opinion, 8/11/20, at 31-32.

Upon our review of the record, we discern no abuse of discretion in the

PCRA court's credibility determination. ***See Spotz***, ***supra***; ***Small***, ***supra***.[5]

Because Pepples's recantation was not credible, we can grant Harmon no relief on this claim.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/23/21

---

[5] We note that, in addition to the reasons that the PCRA court found Pepples's recantation to be incredible as specified in its Opinion, we note that Pepples's testimony at the PCRA hearing was contradicted by other witnesses who testified at the hearing, including an investigator with the Philadelphia District Attorney's Office, who testified that Pepples had provided information in a 2019 interview that was consistent with her trial testimony. ***See*** N.T., 2/26/20, at 50-72.